708 A.2d 19

**ROUSE-FAIRWOOD LIMITED PARTNERSHIP**

v.

**SUPERVISOR OF ASSESSMENTS OF PRINCE GEORGE'S COUNTY, Maryland.**

No. 793, Sept. Term, 1997.

Court of Special Appeals of Maryland.

April 7, 1998.

668

**670**

Kurt J. Fischer (Evelyn W. Pasquier and Piper & Marbury, L.L.P., on the brief), Baltimore, for appellant.

David M. Lyon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, HOLLANDER and SONNER, JJ.

HOLLANDER, Judge.

This appeal focuses on the phrase "more intensive use" as it was used in Md.Code (1986, 1994 Repl.Vol., 1996 Cum.Supp.), § 8–209(h)(1)(ii) of the Tax–Property Article ("T.P.").[1] On December 1, 1994, the Supervisor of Assessments for Prince George's County, appellee, imposed an agricultural transfer tax and penalty upon appellant, Rouse–Fairwood Limited Partnership ("Rouse"), in connection with three properties

---

1. The statute was amended in 1997, and the provision now appears at T.P. § 8–209(h)(1)(i). The amendment expressly provided that it "shall be applicable to all taxable years beginning after June 30, 1997." 1997 Md. Laws Chap. 326. As the amended version of the statute is not applicable to this case, we shall refer to the statutory version of T.P. § 8–209(h)(1)(ii) that was in effect at the relevant time, unless otherwise noted.

that appellant owned in Prince George's County. The Maryland Tax Court upheld that determination on February 21, 1996, and, by order dated March 28, 1997, the Circuit Court for Prince George's County affirmed. Rouse timely noted its appeal and presents two questions for our review, which we have rephrased slightly:

I. Did the Tax Court err in construing the language of T.P. § 8–209 to equate "more intensive use" of land with enhanced value and flexibility or variety of use, as opposed to the traditional factors of intensity that measure the impact of use on the land?

II. Did the Tax Court err in tacitly rejecting or failing to address Rouse's argument that the intensity of use permitted on Parcels 2 and 3, when viewed separately, is less under M–X–C zoning?

For the reasons that follow, we answer the first question in the negative and the second question in the affirmative. Therefore, we shall affirm in part and reverse in part and remand for further proceedings.[2]

### Factual background

The facts are largely undisputed. In 1990, Rouse acquired three properties in Prince George's County from three different owners, consisting of a total of 1,058 acres located just west of the City of Bowie (the "subject properties"). Parcel 1 measures approximately 473 acres, Parcel 2 measures approximately 339 acres, and Parcel 3 measures approximately 246 acres. At the time the subject properties were acquired, each was used as a sod farm and had an agricultural use tax assessment. To maintain that favorable assessment, appellant filed three declarations of intent to maintain the agricultural use of the properties for five years (*i.e.*, through June 30,

---

2. Following the filing of our opinion in this case on February 4, 1998, appellant filed a motion for reconsideration, to which appellee responded. In view of the motion, we have determined to modify our original opinion in certain respects. Accordingly, we are withdrawing the opinion as filed and substituting this opinion in its place.

1995). Pursuant to T.P. § 13–305, such a declaration of intent permits a transferee to avoid imposition of the 5% agricultural land transfer tax. If the transferee fails to comply with the declaration of intent, however, or if the property fails to qualify during the five-year period for the agricultural assessment under T.P. § 8–209, then T.P. § 13–305(c)(2)(i) provides that the agricultural transfer tax, plus a 10% penalty, "is due on that portion of land that fails to comply with the declaration of intent or to qualify for farm or agricultural use."

Pursuant to T.P. § 8–209(h)(1)(ii), land did not qualify for an agricultural use assessment if it was "rezoned after July 1, 1972, to a more intensive use than the use permitted on or before July 1, 1972. . . ." On July 1, 1972, the subject properties were zoned R–R (Rural Residential).[3] T.P. § 8–209(h)(1)(ii) stated:

> [T]he following land does not qualify to be assessed under this section:
>
> * * * *
>
> (ii) land rezoned after July 1, 1972, to a more intensive use than the use permitted on or before July 1, 1972, if a person with an ownership interest in the land has applied for or requested the rezoning. . . .

In 1992, the District Council amended the Prince George's Code to include a Planned Unit Development ("PUD") zoning category, called Mixed Use Community Zone ("M–X–C"). One of the stated purposes of the M–X–C zone is to "[c]reate a comprehensively planned community with a balanced mix of residential, commercial, recreational, and public uses." Prince George's County Code § 27–546.1. Appellant participated in developing the ordinance that created the classification. Generally, it allows a PUD on property that is at least 750 acres in size and permits a phased-in development of property.

---

**3.** Under the amended provision, applicable after June 30, 1997, land does not qualify for an agricultural use assessment if it is "rezoned to a more intensive use than the use that immediately preceded the rezoning. . . ."

Appellant filed an application in May 1993, to rezone the subject properties to M–X–C and, in May 1994, the District Council approved the rezoning.[4] Rouse indicated that it intends to develop the subject properties over a period of ten to fifteen years.

In December 1994, appellee issued three separate notices to appellant stating that the May 1994 rezoning of the subject properties to M–X–C violated Rouse's declarations of intent. Therefore, the Supervisor of Assessments imposed the agricultural transfer tax, plus penalties, on each parcel. In total, the Supervisor levied $408,377.50 in taxes and $40,837.75 in penalties. Appellant challenged the assessments by way of an appeal to the Maryland Tax Court.

On January 17, 1996, the Tax Court held a day-long hearing at which both parties presented expert witnesses. The experts testified about the permitted uses of the subject properties under the current M–X–C zoning and those that were permitted on July 1, 1972, when the subject properties were zoned R–R. The experts also expressed their opinions about whether M–X–C zoning constituted a more intensive use than R–R zoning as of July 1, 1972.

Under R–R zoning in 1972, the minimum lot size was 20,000 square feet for single family detached residential development. "Cluster" developments,[5] with reduced lot sizes and the flexibility to introduce single family attached dwellings (townhouses) into the total dwelling yield of a development proposal (but at no greater number of total units than could be obtained under the maximum allowed non-cluster density of 2.0 units per acre), were also permitted. But the difference between

---

**4.** At the time of the rezoning, the subject properties were zoned R–E (Rural Estate). For purposes of this appeal, however, the parties agree that the R–E zoning is irrelevant. Under T.P. § 8–209(h)(1)(ii), the relevant zoning is R–R (Rural Residential), because, as we observed, that was the zoning that was in effect on July 1, 1972 with respect to the subject properties.

**5.** Cluster developments are a discretionary, alternative development scheme available only through the subdivision process.

the reduced lot size (10,000 square feet for detached dwellings and 1,500 square feet for townhouses) and the conventional lot size (20,000 square feet) was to be set aside as open space elsewhere in the parcel. Nonresidential uses, permitted as of right, included, *inter alia:* Churches, libraries, museums, public buildings, public parks, and animal hospitals. Uses permitted by special exception included, *inter alia:* airports, antique shops, cemeteries, commercial recreational attractions, golf courses, hospitals, motels, horse racing tracks, sanitary landfills, sawmills, and tourist homes. Principal uses not enumerated as permitted uses or as special exception uses were expressly not allowed in the R–R zone.

M-X-C zoning permits a mix of uses on the land. In order to obtain M–X–C zoning, a Preliminary Development Plan ("PDP") must accompany the rezoning application. The ordinance requires a PDP to comply with the following criteria: (1) at least 30% of the gross area must be devoted to community use areas; (2) at least 10% of the gross area must be devoted to single family, low density dwellings; (3) at least 20% of the gross area must be devoted to single family, medium density residential units; (4) no more than 15% of the gross area may be devoted to "other residential" units; and (5) nonresidential areas must comprise between 5% and 20% of the gross area of the zone. These general parameters of the development are refined in the subsequent phases of the approval process, in which the developer must submit a Comprehensive Sketch Plan ("CSP") and a Final Development Plan ("FDP"). Both the CSP and FDP must be consistent with the PDP. Under's Rouse's PDP, 25% of the gross acreage will be used for single family low density dwellings, 20% for single family medium density dwellings, 15% for other residential uses, 5% for nonresidential uses, and 35% for community use areas.

Permitted residential uses in the M–X–C zone include: single family detached houses; townhouses; duplex houses; and apartments. As a matter of right, various nonresidential uses are also permitted under M–X–C zoning, but not under R–R zoning: banks; data processing facilities; eating or

drinking establishments; research and development and testing laboratory; blueprinting, book, camera, gift, jewelry, music, souvenir, or other specialty stores; department store; dry cleaning; drugstore; food and beverage store; gas station; hardware store; pet shop; photographic supply store; seafood market; repair shops; variety and dry good stores; and an arena.

Appellant's land use planning expert, Thomas Kieffer, the head of the planning and zoning department of Ben Dyer Associates, opined that "the development permitted under the M–X–C at [the subject properties] is less intense than that permitted under the R–R." He compared the properties under the two zones, using some of the criteria developed in the 1960s by the Federal Housing Administration ("FHA")[6] and some of his own. Kieffer admitted that he could not perform an analysis using all of the FHA factors, however, because the factors were designed to analyze completed projects rather than planned projects. He considered the following factors: (1) density, expressed in terms of dwelling units per acre ("du/ac") for residential development, and floor area ratio ("FAR") for nonresidential development; (2) average household size; (3) student yield; (4) sewage disposal requirements;

---

**6.** The factors used by the FHA in determining Land Use Intensity ("LUI") are found in Byron R. Hanke, *Planned Unit Development and Land Use Intensity*, 114 U. Pa. L.Rev. 15 (1965). Hanke, who was then the Chief Land Planner for the FHA, described the intensity factors as follows:

LUI expresses a group of six physical relationships in a developed property. First, it expresses the overall relationship of the amount of building mass (total floor area) to the amount of land area. Second, it relates total open space of a property to its total floor area. In other words it contrasts the exterior open space with the interior residential space, thereby relating the individual to his environment. Third, in considering exterior open space, LUI distinguishes between space that is for people, called livability space, and the space that is used for cars. Fourth, it considers large recreation space as well as other outside livability space. The final two ratios relate the number of car storage spaces to the number of living units. One considers only long term parking spaces for occupants, while the other considers all spaces including short time spaces for guests.
*Id.* at 22.

(5) parking requirements; and (6) traffic congestion. Kieffer concluded that, in every category except two (parking requirements and traffic generation during p.m. peak hour trips), the R–R zoning category was more intensive than that under M–X–C zoning.

Regarding the nonresidential uses, Kieffer compared a hospital, which was a permitted use in R–R zoning in 1972 as a matter of right, to the mix of office, service, and institutional type uses permitted under M–X–C zoning. For comparison purposes, Kieffer used the Greater Laurel Beltsville Hospital, which had been built in an R–R zone, on a 48 acre parcel. After considering the intensity factors, Kieffer concluded that the hospital under R–R zoning would be more intensive than the commercial type uses permitted under M–X–C zoning.

Kieffer's comparison of residential development under R–R zoning and M–X–C zoning focused largely on the differences in density. Specifically, he determined that, based on a housing mix of 75% single family detached dwellings and 25% single family attached dwellings, the R–R zoning had a net density of 1.849 dwelling units per acre. On the other hand, under M–X–C zoning, pursuant to the PDP approved as part of the M–X–C rezoning for the subject properties, based on a housing mix of 37% single family detached dwellings, 58% single family attached dwellings, and 5% multi-family housing, the net density would be 1.79 du/ac. In his analysis of the M–X–C zoning, Kieffer deducted approximately 60 acres to account for a proposed road interchange that exists on the current master plan. Kieffer did not subtract this 60 acres when he analyzed the subject properties under R–R zoning, however, because the interchange did not exist on the 1972 master plan. Instead, Kieffer subtracted 21 acres under his R–R zoning analysis to account for an "outer beltway" that had been shown on the 1972 master plan.[7]

---

7. The parties dispute whether the difference—39 acres—should have been deducted under the R–R analysis. Kieffer acknowledged that, if he had deducted 60 acres under R–R zoning, instead of 21 acres, there would be 1,773 total residential units under R–R zoning, compared to

In viewing the subject properties collectively, Keiffer concluded that M–X–C zoning was less intensive than R–R zoning. In addition, Kieffer analyzed each of the subject properties individually. For Parcel 1 he concluded that the residential uses under M–X–C were more intensive than under R–R, but that the nonresidential uses on that parcel were less intensive than under R–R. With respect to Parcel 1, he opined that M–X–C zoning was not more intense than R–R zoning. He explained: "[I]t's too close to call. I can't say for sure that the overall effect is that parcel one would be more intense under the M–X–C zone." For Parcels 2 and 3, however, which are solely targeted for residential development, Kieffer concluded that M–X–C zoning was less intensive than under R–R zoning.

Appellee's expert, Thomas Lockard, a land use planner with the Prince George's County Planning Department of the Maryland–National Capital Park & Planning Commission, testified, in response to a question by the Tax Court, that, during the relevant time period, the only dwelling types permitted under R–R zoning were "single family detached [homes] and if you're under the cluster [development] provision, single family attached [homes]." [8] Record Extract at 289. He further noted that, unlike in the M–X–C category, no apartments were permitted in an R–R property. Lockard also stated that, under M–X–C zoning, the permitted dwellings include single family detached houses, townhouses, duplexes, triplexes, and apartment buildings. Regarding nonresidential uses, Lockard

---

1,799 residential units under M–X–C zoning. Appellant argues that, because T.P. § 8–209 only requires comparison with the "use permitted on or before July 1, 1972," the interchange should not be considered, because it was not on the 1972 master plan. We need not resolve this issue, however, because, as we shall explain, density is not the sole criterion in determining whether the rezoning results in a more intensive use of the land.

8. On October 17, 1972, the County Council of Prince George's County amended the zoning ordinance to prohibit attached dwellings from cluster development in an R–R zone. That amendment is not applicable to this case, however, because T.P. § 8–209 requires a comparison of zoning in effect on July 1, 1972.

listed the commercial establishments permitted as a matter of right under M–X–C, but not under R–R zoning. He also observed that a hospital would be "probably the most intensive use that would have been permitted in the R–R zone." Lockard offered his opinion that, "based ... on the types of uses generally permitted under the R–R zone versus the types, quantities, and amounts of uses permitted under the M–X–C zone," the M–X–C zone, under Rouse's approved PDP, is more intensive than was the R–R zone in 1972.

In its analysis, the Tax Court focused on the meaning of the phrase "more intensive use" in T.P. § 8–209, which is not defined in the statute. The court also acknowledged a county ordinance listing the various zoning classifications, ranging from least to most intensive. It states:

> [T]he order of intensity of zones is listed as follows, beginning with the least intense zone and progressing to the most intense:
>
> (1) R–O–S, O–S, R–A, R–E, V–L, R–L, V–M, **R–R**, R–S, R–80, R–55, R–M–H, R–35, R–20, R–M, R–T, R–30, R–30C, R–18, R–18C, R–U, R–10A, R–10, R–H, C–A, C–O, **M–X–C**, M–U–TC. . . .

Prince George's County Code § 27–109(b) (boldface added). The Tax Court noted, however, that although M–X–C is listed as being more intensive than R–R, the testimony demonstrated that the listing was "a pretty arbitrary thing" and that it was done for other purposes.

In reaching its conclusion regarding the subject properties, the Tax Court reasoned:

> [A]s far as I am concerned, [the Legislature was] looking at it from the standpoint that the property owner was taking an action to make something more valuable, and to be able to do something with a piece of property that they could not do before.
>
> ... [S]eldom have I ever seen somebody requesting a rezoning of property if it wasn't going to end up being a financial benefit to them. This is generally what happens.

Now, in this particular situation, what has been ably presented to this Court, and done in a very detailed fashion, is that when I define intensive, I should do it and limit my definition of it to whether or not there are, for instance, more units that are created by this rezoning. And it's represented that it's actually less.

In other words, it's been shown here by various exhibits and testimony that by proceeding in the manner that [appellant] is allowed to do under the M–X–C zoning, that we actually end up with less units than we do under the R–R; that when we take all of the other factors that deal with intensities, that for the most part not all of them, but most of them come up less than R–R.

Unfortunately for [appellant], I do not feel that that alone is the criteria that has to be factored in in making a decision as to what is meant by the word intensive as used in 8–209. And I say that for this reason—it is undisputed that [appellant] is going to be able to do, as a matter of right, not as a matter of special exception, but as a matter of right more things than could be done under the R–R zone.

For instance there's a whole laundry list of commercial type activities that a property owner with this type of zoning is entitled to do under this type zoning that they couldn't do under R–R. There is a difference in the type of residential units that they can have in this zoning that they couldn't have under R–R.

Again, I'm not losing sight of the fact about the densities and how they have to remain. But still for instance we know this, that under R–R you couldn't have an apartment house. Under this particular zoning that you can have an apartment house.

*The bottom line is this—is that there is much more leeway exists as far as the zoning code goes to the property owner with this type zoning than with the leeway that the property owner had under an R–R zoning. And as far as I am concerned, that becomes a factor of making something more intensive.*

As to continue on and walk through this, it doesn't take an extremely intelligent or educated person to realize that there are not going to be a great number of properties that end up with this type of zoning in Prince George's County.

And the reason there's not going to be a great number of them is that number one, you have to have a minimum of seven hundred and fifty acres to even begin to quali[f]y for this. As a practical matter, and let—what really happens here as I see it, is that the property owner ends up not without restrictions. There are parameters that are built into this and guidelines that have to be followed, but for all intents and purposes this property owner gets to structure this in such a manner that they can go ahead and do pretty much everything they want to do under—as far as developing this piece of property goes.

In other words, we even had testimony here today that it may be ten to fifteen years before all of the things that are going to be done with this property are eventually done. And again I cannot ignore the fact, nor do I criticize it in any way, shape or form, that it appears that the property owner in this case, or [appellant] in this case, is really the one that nudged the county to turn around and create a zoning category such as this.

\* \* \* \*

... I would be like an ostrich sticking its head in the sand if I didn't think that the Rouse–Fairwood Development Limited Partnership was moving forward to develop this land in a manner that is going to be financially to their best interest.

And again, there is nothing wrong with that.

\* \* \* \*

But the decision that I have to make today is whether or not I feel that under this section of the Code, that when this became M–X–C if it went to a more intensive use. And it is not easy. It is not an easy decision to make.

But I am making the decision that it is subject to the tax, and that it was a more intensive use. And here is one of the real reasons that I do, and bearing in mind all of the testimony that I've heard, and all the evidence that's been received here today.

And I'm quoting, you know, from an annotation that's under this section. And it says this section must be strictly construed. The preferential treatment accorded by this section is essentially an exemption, and as such the section must be strictly construed. . . .

And then the preferential treatment accorded by this section is essentially an exemption and as such must be strictly construed in favor of the taxing authority. If any real doubt exists as to the propriety of an exemption, that doubt must be resolved in favor of the State.

And that is exactly where I find myself in connection with this particular situation. I have sat here and I have listened very carefully. I have turned it over in my mind many different ways. . . .

\* \* \* \*

. . . I have sat here, and as difficult as it is, when I apply the law as I just read it from a couple of different Maryland cases, to doubt an exemption is to deny an exemption. And that's where I am here. I doubt it, and I have to deny it. So the Court will sign an order affirming the assessment that was made against this property by the Supervisor. . . .

Accordingly, on February 21, 1996, the Tax Court issued an order affirming appellee's decision. Appellant then sought review in the circuit court. In an oral opinion issued March 28, 1997, the circuit court affirmed the Tax Court, stating:

I agree with the taxing authority. I see intensive—I picture this bucolic country side with horses and chickens and pigs and so forth. And we start there and we move toward the city. We start having our suburbs with sprawling . . . homes and so forth.

So, each time as we move in towards the big city, we are getting more and more intense use and I think that's what the tax judge found in this case, that in fact when we went from rural residential to this mixed use of this land in allowing light industry and so forth, it was a more intense use than when it was under rural residential.

I don't believe he made his decision just on the fact that the value of land went up, but I believe his definition of intense just is in fact [sic]....

I believe he was correct not just by the standard of review. I believe he was correct. I believe I would have come to the same conclusion.... Under the appropriate standard of review, he was correct....

This appeal followed. We will include additional facts in our discussion.

### Discussion

### I.

Despite its name, the Maryland Tax Court is an administrative agency. Md.Code. (1988, Cum.Supp.1997), § 3–102 of the Tax–General Article ("T.G."); *see Prince George's County v. Brown*, 334 Md. 650, 658 n. 1, 640 A.2d 1142 (1994); *Abington Ctr. Assocs. Ltd. Partnership v. Baltimore County*, 115 Md. App. 580, 589, 694 A.2d 165 (1997). A party may appeal a final decision of the Tax Court to the circuit court for the jurisdiction in which the property is located. T.P. § 14–513. The final decision of the circuit court may be appealed to this Court. T.P. § 14–515.

We begin our analysis by setting forth the standard of review of an administrative agency's decision. On review, our role is the same as that of the circuit court. *Ahalt v. Montgomery County*, 113 Md.App. 14, 20, 686 A.2d 683 (1996); *Department of Health & Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994); *Maisel v. Montgomery County*, 94 Md.App. 31, 34, 614 A.2d 1333 (1992); *Mortimer v. Howard Research & Dev. Corp.*, 83 Md.App. 432, 442, 575 A.2d 750, *cert. denied*, 321 Md. 164, 582 A.2d 499

(1990). This means that, like the circuit court, we review the agency's decision. *Ahalt,* 113 Md.App. at 20, 686 A.2d 683. Judicial review of Tax Court decisions is severely limited, however, *CBS Inc. v. Comptroller of the Treasury,* 319 Md. 687, 697–98, 575 A.2d 324 (1990); *Maisel,* 94 Md.App. at 34, 614 A.2d 1333, because Tax Court decisions are considered *prima facie* correct, and they are to be reviewed "in the light most favorable to that court." *Maisel,* 94 Md.App. at 34, 614 A.2d 1333; *see Cox v. Prince George's County,* 86 Md.App. 179, 187, 586 A.2d 43 (1991).

On review, a decision of the Tax Court must be affirmed if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record. *CBS,* 319 Md. at 697–98, 575 A.2d 324; *Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985); *Maisel,* 94 Md.App. at 34, 614 A.2d 1333. Nor may we substitute our judgment for that of the agency as to factual findings that are supported by substantial evidence. *Ramsay,* 302 Md. at 834, 490 A.2d 1296; *Rossville Vending Mach. Corp. v. Comptroller of the Treasury,* 97 Md.App. 305, 312, 629 A.2d 1283, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993).

In contrast to the deferential review accorded to an agency's factual findings, questions of law receive no deference on review. *Young v. Board of Physician Quality Assurance,* 111 Md.App. 721, 726, 684 A.2d 17 (1996), *cert. granted,* 344 Md. 568, 688 A.2d 447, *and cert. dismissed,* 346 Md. 314, 697 A.2d 82 (1997). Consequently, if the Tax Court's decision is based on an interpretation of an ordinance or statute, we are not bound by the agency's interpretation. *Department of Assessments & Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 72, 626 A.2d 360 (1993); *Ahalt,* 113 Md.App. at 22, 686 A.2d 683; *see, e.g., Roach v. Comptroller of the Treasury,* 327 Md. 438, 610 A.2d 754 (1992); *Friends School v. Supervisor of Assessments,* 314 Md. 194, 550 A.2d 657 (1988). To the contrary, when the Tax Court's interpretation of a statute is at issue, the substituted judgment standard applies to an errone-

ous conclusion of law. *Rossville,* 97 Md.App. at 311–12, 629 A.2d 1283; *see also People's Counsel v. Maryland Marine Mfg. Co.,* 316 Md. 491, 497, 560 A.2d 32 (1989).

█ Some matters present questions of fact and law. " 'As to mixed questions of fact and law, an intermediate level of scrutiny applies: such findings must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, "a reasoning mind could reasonably have reached the [tax court's] conclusion." ' " *Rossville,* 97 Md.App. at 312, 629 A.2d 1283 (alteration in original) (quoting *United Parcel Serv., Inc. v. Comptroller of the Treasury,* 69 Md.App. 458, 464, 518 A.2d 164 (1986) (quoting *Ramsay,* 302 Md. at 838, 490 A.2d 1296)).

█ We also note that it is not appropriate for a reviewing court to search the record for evidence to support an agency's conclusions. Moreover, we may not uphold an agency's decision "unless it is sustainable on the agency's findings and for the reasons stated by the agency." *United Steelworkers of Am. v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62 (1984); *see also United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994).

█ As we observed, the central issue in this case is the definition of "more intensive use" as that phrase is used in T.P. § 8–209. The interpretation of a statute presents a question of law. *Papillo v. Pockets, Inc.,* 119 Md.App. 78, 83, 704 A.2d 448 (1997); *Hider v. Department of Labor, Licensing & Regulation,* 115 Md.App. 258, 273, 693 A.2d 17 (1997), *rev'd on other grounds,* 349 Md. 71, 706 A.2d 1073 (1998); *Mayor of Ocean City v. Purnell–Jarvis, Ltd.,* 86 Md.App. 390, 413, 586 A.2d 816 (1991). Because we must review the Tax Court's statutory interpretation, we pause to set forth the seminal principles of statutory construction that will frame our analysis.

█ The guiding principle of statutory construction is to determine and effect the intent of the Legislature. *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995); *Mayor of*

*Baltimore v. Cassidy,* 338 Md. 88, 93, 656 A.2d 757 (1995); *Abington,* 115 Md.App. at 602, 694 A.2d 165. Ordinarily, we look to the language of the statute itself to accomplish this task. *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996); *Allied Vending, Inc. v. City of Bowie,* 332 Md. 279, 306, 631 A.2d 77 (1993); *State v. Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988). Moreover, if the statutory language is plain and unambiguous, and expresses a definite and simple meaning, normally we will not look beyond the words of the statute itself. *Blitz v. Beth Isaac Adas Israel Congregation,* 115 Md.App. 460, 479, 694 A.2d 107, *cert. granted,* 347 Md. 155, 699 A.2d 1169 (1997); *Maisel,* 94 Md.App. at 37, 614 A.2d 1333; *Lone v. Montgomery County,* 85 Md.App. 477, 502, 584 A.2d 142 (1991). In deciding the plain meaning of a statutory term or phrase, however, we may, and often do, consult the dictionary. *Department of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 14, 702 A.2d 690 (1997); *Rossville,* 97 Md.App. at 316, 629 A.2d 1283. Even under the plain meaning rule, we do not ignore the Legislature's purpose if it is readily known. *Pagano,* 341 Md. at 133, 669 A.2d 1339; *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 516, 525 A.2d 628 (1987); *Abington,* 115 Md.App. at 603, 694 A.2d 165.

 In addition, a statute must be read as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. *Curran v. Price,* 334 Md. 149, 172, 638 A.2d 93 (1994); *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993); *Abington,* 115 Md.App. at 603, 694 A.2d 165. We "give every word effect, avoiding constructions that render any portion of the language superfluous or redundant." *Blondell v. Baltimore City Police Dept.,* 341 Md. 680, 691, 672 A.2d 639 (1996); *see also Warsame v. State,* 338 Md. 513, 519, 659 A.2d 1271, (1995).

 When, as here, the Legislature has not defined a statutory term, we must consider the language of the statute itself and give that language its "ordinary and natural meaning [without] resort to subtle or forced interpretations...."

*Maryland–Nat'l Capital Park & Planning Comm'n v. Department of Assessments & Taxation,* 110 Md.App. 677, 689, 678 A.2d 602 (1996), *aff'd,* 348 Md. 2, 702 A.2d 690 (1997); *see also Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994). On the other hand, if the statute is ambiguous, courts should consider not only the literal or usual meaning of the statutory language, but also its "meaning and effect in light of the setting, the objectives and purpose of the enactment." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986); *see also Kaczorowski,* 309 Md. at 513, 525 A.2d 628; *Rossville,* 97 Md.App. at 314, 629 A.2d 1283. Thus, in our effort to effectuate the Legislature's intent, we "may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Tucker,* 308 Md. at 75, 517 A.2d 730; *see also Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1 (1995); *Maryland Auto. Ins. Fund v. Erie Ins. Exch.,* 105 Md.App. 377, 386, 660 A.2d 929 (1995). That said, we may not read a meaning into the statute that is not expressly stated or clearly implied. Nor may we embellish a statute to expand its meaning. *Abington,* 115 Md.App. at 603, 694 A.2d 165; *Department of Economic & Employment Dev. v. Taylor,* 108 Md.App. 250, 277–78, 671 A.2d 523 (1996), *aff'd,* 344 Md. 687, 690 A.2d 508 (1997).

 As a corollary, we note that the agricultural use assessment in this case constitutes a tax exemption. Therefore, it must be strictly construed in favor of the taxing authority. *See Maryland–Capital Park,* 110 Md.App. at 687–91, 678 A.2d 602; *Warlick v. Supervisor of Assessments,* 272 Md. 540, 545, 325 A.2d 587 (1974); *Perdue Foods, Inc. v. Department of Assessments & Taxation,* 264 Md. 672, 687–88, 288 A.2d 170 (1972); *Maisel,* 94 Md.App. at 39, 614 A.2d 1333. We are mindful of what the Court of Appeals stated in *Perdue, Inc. v. State Department of Assessments and Taxation,* 264 Md. 228, 286 A.2d 165 (1972):

It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and if any real

doubt exists as to the propriety of an exemption that doubt *must* be resolved in favor of the State. In other words, "to doubt an exemption is to deny it."

*Id.* at 232–33, 286 A.2d 165 (quoting *Pan Am. Sulphur Co. v. Department of Assessments & Taxation,* 251 Md. 620, 629, 248 A.2d 354 (1968)).

In this case, we are also cognizant of the Legislature's expressed intent in T.P. § 8–209:

It is the intention of the General Assembly that the assessment of farmland:

(1) be maintained at levels *compatible with the continued use of the land for farming;* and

(2) not be affected adversely by neighboring land uses of a more intensive nature.

*Id.* § 8–209(b) (emphasis added).

## II.

T.P. § 8–209(h)(1)(ii) does not define "more intensive use." As we discussed earlier, when the Legislature fails to define a statutory term, we ordinarily apply its plain meaning, consistent with the Legislature's intent and purpose.

 Appellant argues that the Tax Court erred as a matter of law because, in construing the phrase "more intensive use," it improperly considered enhanced value and flexibility or variety of use, rather than "the traditional factors of intensity that measure the impact of use on the land." Relying on a dictionary definition of the term "intensive," appellant claims that the Tax Court's interpretation is inconsistent with its plain meaning. Appellant states that "intensive" means "of, relating to, or marked by intensity," or "highly concentrated." *Webster's II New Riverside Dictionary* 635 (New Riverside Publishing Co.1976). The same dictionary defines "intensity" as "exceptionally great concentration, power or force." *Id.* "Intensity" is also defined as "the magnitude of a quantity (as force or energy) per unit (as of area, charge, mass, or time)." *Merriam Webster's Collegiate Dictionary,* 608 (10th

ed.1997). Appellant further notes that "variety" means "diversity." *Webster's II Riverside, supra,* at 1277. "Variety" also means "the quality or state of having different forms or types." *Merriam Webster's, supra,* at 1307. "Use" is defined, *inter alia,* as "a method or manner of employing or applying something," and as "the legal enjoyment of property that consists in its employment, occupation, exercise, or practice." *Id.* at 1301.

As we noted, appellant asserts that the Tax Court erred in equating land use intensity with variety of use. Instead, appellant insists that the correct definition of "more intensive use" is that utilized by its expert, Kieffer, in conducting his analysis of the subject properties under both zoning categories. Although appellant relies on intensity factors utilized by the FHA, Kieffer only partially relied on those factors. Indeed, he substituted some of his own. Moreover, the FHA criteria were devised for assessing completed projects.

The Tax Court observed that if the factors used by appellant's expert were to govern the definition of "more intensive use," the rezoning of the subject properties to M–X–C would not have constituted a more intensive use. Based on this observation, appellant argues that the Tax Court made a finding of fact that M–X–C zoning was, indeed, less intensive than R–R zoning. That is not what the Tax Court found, however. The transcript of the Tax Court's opinion, which we have quoted at length, makes clear that it did not believe appellant's definition should be applied to T.P. § 8–209. Despite appellant's reliance on the conclusion of its expert that M–X–C zoning is less intensive than R–R zoning, we believe the Tax Court correctly construed the phrase "more intensive use" in T.P. § 8–209, and its decision was supported by substantial evidence.

In considering the plain meaning of the phrase "more intensive use," it would seem that rezoning a parcel to a classification that results in less density could constitute a less intensive use. *Cf. Bosley v. Hospital for Consumptives,* 246 Md. 197, 204, 227 A.2d 746 (1967) (observing that rezoning

changes that increased density constituted "more intensive residential use"). Although appellant contends that the intensity analysis conducted by its expert was not restricted to density, appellant argues that its expert showed that M–X–C zoning, based on the approved PDP for the subject properties, will result in less density and, therefore, its use is inherently less intensive. We do not believe, however, that the Tax Court was *required* to consider a decrease in density as dispositive in determining whether the property was rezoned to a more intensive use. *See, e.g., Maisel,* 94 Md.App. at 37, 614 A.2d 1333 (observing that under Montgomery County ordinance, density was but one factor in determining more intensive use).

It is plain to us, as it was to the Tax Court, that M–X–C zoning permits a wide variety of uses, as a matter of right, that were not otherwise permitted for R–R zoning. These additional uses, such as apartments, banks, dry cleaners, department stores, and other commercial establishments, clearly would affect the overall character of the subject properties. As the circuit court observed, by permitting these kinds of uses, the property is further removed from an agricultural state. Put another way, if a property is rezoned to permit a greater number of uses than would otherwise be permitted under the prior zoning (or, in this case, under the zoning that existed on July 1, 1972), there is a definite and palpable change in the potential manner or method by which the property may be enjoyed or used. In the context of the statute, this plain meaning of the phrase "more intensive use" certainly extends to the broad kinds of uses of the property that were not permitted under R–R zoning. It is this potential change in character, along the continuum toward an urban or industrial environment, that governs whether the property has been rezoned to permit a "more intensive use." We believe that the Tax Court correctly determined as much in this case.

Our decision in *Maisel* is instructive. There, we concluded that the proper analysis for determining a "more intensive use" required a comparison of the zoning categories in gener-

al, not what may eventually be built on the property. 94 Md.App. at 38, 614 A.2d 1333. Similarly, we believe that the proper analysis under T.P. § 8–209 entails a general comparison of the two zoning classifications in issue. Thus, by rezoning a property to a category that permits additional uses that were not allowed under the prior zoning (or, in this case, the zoning that existed in July 1972), the property may be rezoned to a "more intensive use." *See Maisel*, 94 Md.App. at 38, 614 A.2d 1333.

The parties sharply dispute the application of *Maisel* to this case. We agree with the Tax Court and appellant that *Maisel* does not control this case, because the phrase "more intensive use," which was at issue there, was specifically defined in the Montgomery County Code. Moreover, *Maisel* involved the comparison of two Euclidian zones, while the instant case presents a Euclidian zone (R–R, as it existed on June 30, 1972) as a base zone for comparison to a planned unit development (or floating zone), the M–X–C, as embodied in Rouse's approved preliminary development plan. Nevertheless, our reasoning in *Maisel* is equally applicable here.

■■■ We also believe the Tax Court correctly rejected appellee's argument that Prince George's County Code § 27–109(b) "clearly indicates that R–R is less intensive than M–X–C." The evidence at the Tax Court proceeding indicated that, in creating this hierarchy, which purports to list the zoning categories from least intensive to most intensive, no specific evidence regarding intensity was considered. Indeed, as the Tax Court found, the hierarchical listing of zones was "a pretty arbitrary thing." In any event, the Tax Court considered the local provision and observed that, if § 27–109(b) of the Prince George's County Code were the only guide, it would be determinative. The court also said, "it's there and it[ ] says the M–X–C is more intense." Nevertheless, the Tax Court did not decide the case based solely on that provision.

Even if we were to conclude that the phrase "more intensive use" is ambiguous, the result would be the same. Any other result would be illogical, inconsistent with common sense, and

in contravention of the Legislature's intent. *See Tucker*, 308 Md. at 75, 517 A.2d 730; *Romm*, 340 Md. at 693, 668 A.2d 1; *Maryland Auto. Ins. Fund*, 105 Md.App. at 386, 660 A.2d 929.

We are satisfied that, in viewing the statute as a whole, our interpretation and that of the agency and circuit court were correct. Section 8–209(h)(i) [9] stated that land does not qualify for the agricultural use assessment if it was

zoned on or before July 1, 1972, for industrial, commercial, or multifamily residential use, if the zoning occurred on the application or at the request of a person who has or previously had an ownership interest in the land. . . .

From this provision the Legislature clearly intended that any zoning initiated by the landowner prior to July 1, 1972, to industrial, commercial, or multifamily residential use, was *per se* excluded from the agricultural use assessment. *See Supervisor of Assessments v. Ely*, 272 Md. 77, 84–85, 321 A.2d 166 (1974) ("We agree ... that the [section of the statute prior to recodification] mandates the conclusion that land zoned industrial, commercial, or multifamily residential at the 'instance' of its owner, even though being farmed, will not continue to be used for farming and is not entitled to assessment based upon such use.").

Admittedly, M–X–C zoning does not fit squarely into an industrial, commercial, or multifamily category. Nevertheless, commercial and multifamily uses, in addition to single family residential development, are permitted as a matter of right under M–X–C zoning. Indeed, commercial uses are required under M–X–C zoning. Moreover, as we previously noted, one of the purposes of M–X–C zoning is to "[c]reate a comprehensively planned community with a balanced mix of residential, commercial, recreational, and public uses." Prince George's County Code § 27–546.1. Had M–X–C zoning existed in 1972, we do not believe that Rouse could have maintained the agricultural use assessment, and it would be illogical to inter-

---

**9.** This provision was deleted in the 1997 amendment to the statute. Nevertheless, it is pertinent to our discussion. *See supra* note 1.

pret the statute to permit such uses today. In light of the Legislature's expressed intention that the assessment of farmland "be maintained at levels compatible with the *continued use* of the land for farming," T.P. § 8–209(b)(1)(emphasis added), we see no other sound result.

■ As we mentioned earlier, appellant also complains that the Tax Court's interpretation of the statute erroneously included consideration of whether the rezoning increased the value of the property, although there was no evidence that the rezoning actually increased the value of the subject properties. We agree that the definition of the phrase "more intensive use" does not include a consideration of whether the rezoning has increased the value of the property. Nevertheless, an increase in the property's value after rezoning that was requested by a person with an ownership interest in the land may be an indication that the rezoning has, in fact, resulted in the potential for a more intensive use. The Tax Court's remark that it believed appellant's decision to request a rezoning constituted an action to make the property more valuable merely recognized this possibility. Indeed, after observing that it thought that Rouse was moving forward to develop the subject properties in a manner that was in its financial interest, the Tax Court specifically acknowledged that "there is nothing wrong with that."

■ Even if appellant were correct that the Tax Court erroneously interpreted the statute to include consideration of an increase in value of the property, the Tax Court's construction of "more intensive use" was still supported by substantial evidence. As we have observed, the Tax Court found, and it is undisputed, that there are several kinds of uses permitted under M–X–C zoning, even as limited by Rouse's approved PDP, that were not permitted *as a matter of right* under R–R zoning as it existed on July 1, 1972. Those uses are listed in Prince George's County Code § 27–547 and were described at the Tax Court proceeding by appellant's expert, Lockard. Therefore, the Tax Court properly determined that appellant's properties were rezoned to a more intensive use. Moreover,

we reiterate that in cases such as this, if the Tax Court had any doubt as to the applicability of the exemption—and it did—that doubt was to be resolved in favor of the taxing authority. *See Perdue,* 264 Md. at 232–33, 286 A.2d 165.

### III.

In its brief to this Court, Rouse summarized the alternative argument that it presented to the Tax Court:

> [*I* ]*f* the Tax Court were to find that, because of the nonresidential uses permitted under M–X–C zoning on a 53 acre portion of Parcel 1 . . ., the use permitted on *that* parcel under M–X–C was more intensive than that permitted under R–R zoning, the Court must *then* evaluate the uses permitted on Parcels 2 and 3 separately.

(Italics added). Appellant contends that the Tax Court failed to address its "alternative argument" or to make any specific findings of fact or conclusions of law as to whether the three parcels were treated separately or as one. Because of this, appellant argues that we must remand the case for findings of fact and conclusions of law regarding Parcels 2 and 3.

Appellant's alternative argument is grounded in T.P. § 13–305(c)(2)(i), which provides that, "[i]f there is a failure to comply with a declaration of intent filed [under T.P. § 13–305] . . . or there is a failure to qualify for the farm or agricultural use assessment under § 8–209 . . . during the time that a declaration of intent is in effect, the agricultural land transfer tax, plus penalty, is due [only] on that portion of the land that fails to comply with the declaration of intent or to qualify for farm or agricultural use." Rouse argues, alternatively, that only Parcel 1 is noncomplying because, under appellant's PDP, nonresidential development is planned only on approximately 53 acres of Parcel 1; the remainder of Parcel 1 and all of Parcels 2 and 3 are targeted only for residential development and open space under the PDP, and thus they are still entitled to the agricultural tax assessment.

As we observed earlier, the Tax Court stated, in pertinent part:

The bottom line is this—that there is much more leeway exists as far as the zoning code goes to the property owner with this type zoning than with the leeway that the property owner had under an R–R zoning. And as far as I am concerned, that becomes a factor of making something more intensive.

As to continue on and walk through this, it doesn't take an extremely intelligent or educated person to realize that there are not going to be a great number of properties that end up with this type of zoning in Prince George's County.

And the reason there's not going to be a great number of them is that number one, you have to have a minimum of seven hundred and fifty acres to even begin to quali[f]y for this.

Appellee asserts that the Tax Court clearly rejected Rouse's alternative argument because it focused on the integrated nature of M–X–C zoning and the flexibility of development concerning the entire parcel. Further, appellee argues that T.P. § 8–209(h)(1)(ii) requires a comparison of R–R zoning and M–X–C zoning, characterized by all of its uses, not by the developer's designated use areas and attendant use limitations. Appellee also points out that none of the three subject properties, alone, was large enough to qualify for M–X–C zoning, which requires a minimum of 750 acres. In addition, the rezoning of the subject properties was accomplished through a single application for rezoning, approved by one ordinance, in accordance with a single PDP. Thus, appellee contends it is "very clear" that the Tax Court compared the new zoning "characterized by all of its uses" when it found a more intensive use, and that the reassessment applies to all three parcels.

In addressing appellant's contention, the circuit court said:

I ... believe [the Tax Court] considered the alternative argument, and in fact he responded to it. I don't think he responded to it specifically in those words, but I think in his conclusion in treating this as one and saying that he was

treating as one and answering the question as to whether he was going to treat each parcel separate.

*Rouse Fairwood v. Supervisor of Assessments,* Civil Action Law 96–05859 (Cir. Ct. Prince George's County, Maryland Mar. 28, 1997).

It is well settled that an agency's decision may be affirmed based only upon the agency's findings of fact and for the reasons presented by the agency. *United Parcel,* 336 Md. at 577, 650 A.2d 226; *Washington Nat'l Arena Ltd. Partnership v. Comptroller of the Treasury,* 308 Md. 370, 380, 519 A.2d 1277 (1987); *United Steelworkers,* 298 Md. at 679, 472 A.2d 62; *Department of Economic & Employment Dev. v. Propper,* 108 Md.App. 595, 607, 673 A.2d 713 (1996). The purpose of this requirement is to afford the parties appearing before an administrative agency a right to know the facts relied upon by the agency in reaching its decision as well as to permit meaningful judicial review of the agency's findings. *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772 (1991). "At a minimum, one must be able to discern from the record the facts found, the law applied, and the relationship between the two." *Forman v. Motor Vehicle Admin.,* 332 Md. 201, 221, 630 A.2d 753 (1993).

We agree with appellant that the Tax Court did not adequately address Rouse's alternative argument. Admittedly, the Tax Court recognized that a minimum of 750 acres is required to qualify for M–X–C zoning. Moreover, the Tax Court observed that apartments are permitted under M–X–C zoning (and it is undisputed that they are permitted under Rouse's approved PDP), but were not allowed under R–R zoning. Thus, although it *appears* that the Tax Court considered the subject properties as a unit, the Tax Court did not indicate whether its finding of more intensive use was predicated only upon that portion of Parcel 1 that is targeted for nonresidential development. Nor did the Tax Court indicate the reasons requiring the increased tax assessment for all three parcels, if only one was actually going to be used more intensively. We believe this failure is significant because,

under T.P. 13–305(c)(2)(i), the agricultural land transfer tax and penalty are due only "on that *portion* of the land that fails to comply with the declaration of intent." (Emphasis added).

Here, three discrete parcels comprised the property that was rezoned to M–X–C, each governed by a separate declaration of intent. We recognize that no single parcel would have been large enough to qualify for M–X–C zoning. On the other hand, applying the plain meaning of T.P. § 13–305, it is arguable that the agricultural land transfer tax and penalty are due only on the offending portion of the land. When, as here, the dispute involves separate parcels that are combined to form a larger property, the question arises as to whether to impose the tax on the combined parcels or only on the particular parcels that will have a more intensive use.

Despite what appellee considers as "very clear," we cannot uphold the Tax Court's decision unless it is sustainable on the Tax Court's findings and for the reasons stated by the Tax Court. *See United Steelworkers,* 298 Md. at 679, 472 A.2d 62; *see also United Parcel,* 336 Md. at 577, 650 A.2d 226. The Tax Court did not state whether its finding of more intensive use was solely limited to Parcel 1, because of its nonresidential uses. Nor did it indicate whether it considered the parcels separately or collectively, or its reasons for doing so. As we cannot determine whether the Tax Court erred in failing to evaluate Parcels 2 and 3 separately, we shall remand to the circuit court with instructions to remand to the Tax Court to determine whether it considered the parcels individually or as a unit, and to provide its reasons.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO THE MARYLAND TAX COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT, 50% BY APPELLEE.**