629 A.2d 1283

**ROSSVILLE VENDING MACHINE CORP.**

v.

**COMPTROLLER OF the TREASURY.**

**No. 1404, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Sept. 1, 1993.

Certiorari Denied Dec. 17, 1993.

Robert L. Hanley, Jr. (Thomas J. Renner, Christine K. McSherry and Nolan, Plumhoff & Williams, Chtd., on the brief), Towson, for appellant.

Deborah B. Bacharach, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Gaylin Soponis, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before ALPERT, HARRELL, JJ., and ROSALYN B. BELL, Judge (Retired), Specially Assigned.

HARRELL, Judge.

This appeal by Rossville Vending Machine Corp. (Rossville or appellant) arises from an order of the Circuit Court for Baltimore County (Smith, J.) affirming a decision of the Maryland Tax Court (Tax Court), which had sustained an assessment for delinquent admissions and amusement taxes issued by the Comptroller of the Treasury (Comptroller) against Rossville.

The sole question posed by appellant for our review, as framed by Rossville, is "[w]hether the [c]ircuit [c]ourt erred in affirming the Maryland Tax Court's decision that cash payments made to players of Rossville's amusement machines were includable as gross receipts and therefore subject to the admissions and amusement tax[.]" We agree with the judg-

ments of the circuit court and Tax Court and, accordingly, shall affirm.

## FACTS

Rossville owned a number of video poker machines that it placed in bars, restaurants, and other establishments frequented by the general public (collectively referred to hereafter as "establishments" or singularly as "establishment"). The machines were activated by patrons placing quarters in them. A player accumulated "points" or "credits" as he or she played and got winning poker hands. When the player accumulated sufficient "credits" or "points," he or she would be paid winnings in cash directly by the owner, or owner's employee, of the establishment (not Rossville), based on the player's number of accumulated "credits" or "points." It was conceded that such payouts constituted violations of Maryland's anti-gambling laws.

Rossville's financial arrangements with each owner of an establishment included a fifty-fifty split of the revenues received from the play of the machines in that establishment, after reimbursement for the owner's winnings payouts and deduction of expenses such as fees and taxes. The establishment would keep records of the payouts made and provide the information to Rossville's routemen. Sometimes Rossville would advance funds to an establishment owner and allow that person to pay back the loan out of the establishment's future share of the net revenues as earned.

Rossville's routemen would periodically visit each establishment where Rossville's machines were placed (only the routemen had access to the quarters in the machines). Generally, their visits were of two different types. A "dump" involved emptying machines of coins, counting the coins, repackaging them for continued use by the establishment, and noting the machines' total receipts. A "collection" visit consisted of again emptying the machines of coins, computing the total receipts during a particular time period (including monies removed during previous "dumps" within that time period), and settling

up with the establishment owner in accord with the financial arrangement described earlier.

When the routeman "settled up," he obtained information as to the amount of payouts made during the time period, generally from the records kept by the establishment's owner or employees, which the routeman could verify against internal accounting mechanisms in the video poker machines. The routemen then returned to Rossville with its share of the monies and documentation reflecting the gross receipts, payouts, and adjustments for fees, taxes, and the split.

A statewide investigation of illegal gambling and the video poker industry in particular, dubbed "Operation Quartermatch," commenced in 1984, with Rossville as one of its targets. Detective Douglas Dunlap of the Baltimore County Police Department was a part of the task force. Detective Dunlap, and others, conducted undercover surveillance of establishments where Rossville's machines were located. They witnessed not only the illegal payouts, but also the activities of the routemen.

Based on the activities thus observed, search warrants were obtained on 7 March 1985 for Rossville's headquarters and fourteen establishments where its machines were located. Various records were seized at each location.

William Watts, an auditor with the Comptroller's office, reviewed the records seized by the police. Based on what these records revealed to him, he conducted a formal amusement tax audit of Rossville. From the seized records and the audit, Watts was able to calculate the total amount of money collected from the machines in the assessment period and the amount of payouts made to players. He computed the total amusement taxes due on the total monies collected (with no deduction for the payouts), and subtracted the amusement taxes previously paid by Rossville for the time period involved, resulting in a deficiency owed to the Comptroller of $736,-033.98. Watts testified before the Tax Court that it was the practice of the Comptroller's office during the period of as-

sessment involved in this case to tax the total amount in the machines.

The Comptroller levied a deficiency assessment[1] against Rossville on 25 September 1985, plus interest and penalties, for the period 15 December 1982 through 6 March 1985. Rossville countered with a refund claim. After the assessment was affirmed and the refund denied by the Comptroller's hearing officer, Rossville concurrently, but separately, appealed both actions to the Tax Court. Because the refund claim aspect has been fully litigated, we will not address it further in this opinion.[2]

The Tax Court held a hearing on the assessment appeal on 17 October 1991. The issue before the Tax Court was whether, for the purpose of computing gross receipts that are subject to the admissions and amusement tax, Rossville could deduct the cash payouts made to the players.

At the hearing, Watts and Dunlap, among others, testified. Dunlap, because of his extensive experience and knowledge of the video poker industry, was offered and received as an expert witness. He testified, among other things, that a company such as Rossville only places video poker machines in locations where it has the exclusive right to do so. He opined that the financial arrangements between Rossville and the establishment owners were typical of the industry, including

---

1. Although the originally assessed deficiency, exclusive of interests and penalty, totaled $859,560.58, this amount was reduced to $736,033.98 by stipulation of the parties in the Tax Court proceedings.

2. The issue in the refund case was whether receipts from video poker machines and other coin-operated amusement devices are taxable as receipts from the use of "sporting or recreational facilities or equipment" in jurisdictions that had not amended their local enactments to clarify that the tax applied to receipts from "games of entertainment". As to this appellant, this issue was resolved in favor of the Comptroller by this Court in an unreported decision. *Comptroller v. Rossville Vending Machine Corporation*, et al., No. 1872 (September 27, 1990), *cert. denied*, 321 Md. 639, 584 A.2d 68 (1991). Receipts from coin-operated amusement devices were found to be subject to admissions and amusement tax as receipts from the operation of "sporting or recreational facilities or equipment".

the necessity to make payouts to the customers so people would play the machines. Watts essentially explained the bases and calculations for the Comptroller's assessment in terms of the information obtained from the seized records and the audit. The Tax Court (Calvert, J.) issued an oral ruling at the end of its hearing affirming the Comptroller's assessment. It followed that with an order to like effect on 19 November 1991.

The circuit court, by its 27 July 1992 Opinion and Order, filed on 29 July, affirmed the Tax Court's decision. The court found that the Tax Court's factual determination concerning the calculation of the assessment was supported by substantial evidence. It rejected Rossville's claim that gross receipts did not include cash payouts made to winning players on the amusement devices holding: "the Maryland Tax Court was not erroneous as a matter of law in its determination that gross receipts included all charges for use of Appellant's amusement devices without deduction for payouts made to customers who played."

Rossville filed a timely appeal from the decision of the circuit court.[3] We will supply additional facts as may be necessary or desirable in our discussion of appellant's issue.

## *ANALYSIS*

### *Standard of Review*

Section 13–532 of the Tax–General Article of the Annotated Code of Maryland provides in pertinent part:

A final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10–215 and 10–216 of the State Government Article.[4]

___

**3.** Rossville has abandoned on appeal its challenge as to whether the Comptroller's calculation of the amount of the assessment was supported by substantial evidence on the record.

**4.** By virtue of 1993 Md.Laws Ch. 59, an omnibus revision and renumbering of Title 10 of the State Government Article was accomplished. Although effective 1 June 1993, the Act contained specific provisions

Md.Tax–Gen.Code Ann. § 13–532(a)(1) (1988). Section 10–215 of the State Government Article provided in pertinent part:

*Decision.*—In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the decision for the agency; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the agency;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

Md.State Gov't Code Ann. § 10–215(g) (1984) (1993 Repl.Vol.).

 It is well settled that judicial review of decisions of the Maryland Tax Court is severely limited. *See CBS, Inc. v. Comptroller of the Treasury,* 319 Md. 687, 697–98, 575 A.2d 324 (1990); *See also Comptroller of the Treasury v. Diebold, Inc.,* 279 Md. 401, 406–08, 369 A.2d 77 (1977). Nevertheless, "a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." *Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985). *See also Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 626, 547 A.2d 190 (1988). Where the interpretation of a statute or

---

governing how its provisions would affect pending administrative appeals. Former § 10–215, for instance, was renumbered and revised as § 10–222, and, as such, applies to actions for judicial review filed on or after 1 June 1993. The case *sub judice* was filed before 1 June 1993. Accordingly, we shall apply and make reference in this opinion to the former numbering and substance of Title 10.

regulation is at issue, the substituted judgment standard is used since such an interpretation involves a question of law. *State Dep't of Assessments & Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 71–72, 626 A.2d 360 (1993); *Baltimore Building & Construction Trades Council v. Barnes,* 290 Md. 9, 14–15, 427 A.2d 979 (1981). "On the other hand, where the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court order if substantial evidence of record supports the agency's decision." *Ramsay, Scarlett & Co.,* 302 Md. at 834, 490 A.2d 1296. "As to mixed questions of fact and law, an intermediate level of scrutiny applies: such findings must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, 'a reasoning mind could reasonably have reached the [tax court's] conclusion.'" *United Parcel Serv., Inc. v. Comptroller of the Treasury,* 69 Md.App. 458, 464, 518 A.2d 164 (1986) (*quoting Ramsay,* 302 Md. at 838, 490 A.2d 1296); *See also Comptroller of the Treasury v. World Book Childcraft International, Inc.,* 67 Md.App. 424, 439, 508 A.2d 148, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986).

### Gross Receipts

The statute at issue in this case, former Article 81, § 402 of the Annotated Code of Maryland, provided in pertinent part:

"(a) Except as otherwise provided in this subtitle, any county by resolution may levy a tax on the *gross receipts* of every person, firm or corporation obtained from sources within the county derived from the amounts charged for ...

\*　　\*　　\*　　\*　　\*　　\*

(iii) The use of sporting or recreational facilities or equipment, including the rental of sporting or recreational equipment, and games of entertainment" [5] (emphasis supplied)

---

**5.** Article 81 was repealed in 1988 in its entirety and substantial portions were transferred into the concurrently enacted Tax–General Article. 1988 Md.Laws ch. 2. The provisions of former § 402(a)(iii) of Art. 81 were transferred to §§ 4–101(b) and 4–102(a) of the Tax–General Arti-

The statute did not otherwise define the phrase "gross receipts", nor did the Comptroller in its regulations. As we shall discuss later, the Comptroller did, through its administration of the admissions and amusement tax, establish a purportedly uniform interpretation and practice regarding treatment of "gross receipts" that it urges we should consider persuasive in our analysis of the statute.

Appellant asserts that the pertinent statutory language is ambiguous. If that be so, it argues, any amounts paid out, either to players or to the location owners to reimburse them for payoffs on its amusement machines, should not have been included in calculating its "gross receipts", because Rossville was not entitled to retain those monies. It points to several aspects of its arrangements with the establishment owners, which it characterized as a joint venture of partnership, to demonstrate its lack of entitlement to the disputed quarters. First, the net receipts derived from the video poker machines were shared equally. Second, the establishment owners and/or its employees made cash payouts to people who accumulated points while playing the video poker machines. The Comptroller acknowledged that these payouts were an integral part of the video poker industry because the payouts were a financial necessity to encourage play of the machines. Establishment owners and Rossville maintained records of the amount of payouts made and Rossville reimbursed the establishment for these payouts. Rossville reimbursed the establishment owners because the machines did not make instant payouts and only Rossville employees had access to the money in the machines. From this state of affairs, Rossville reasons that its partners or co-venturers, the establishment owners, were entitled to reimbursement for the payouts and Rossville, having no claim of right to those monies, should not be taxed on this "phantom income." Rossville also makes a secondary argument that the reimbursed payouts should be treated as

---

cle. Because the operative facts of the instant case occurred before repeal of Article 81, we shall refer to its numbering sequence throughout this opinion.

trade discounts and accorded the status of an adjustment to gross receipts because the payouts are necessary to maintain its competitive position in the video poker machine industry.

The Comptroller, endeavoring to strike a clean line with its reasoning, counters that by the plain meaning of the statute, case law, and the Comptroller's longstanding administrative practice, no deductions are permitted to determine the gross receipts subject to admissions and amusement tax.

As in any case that pivots on the application of a statute, we should not commence our analysis without first recalling the applicable and often-stated rules in aid of statutory construction. To ascertain and effectuate the actual legislative intention in enacting any statute is, of course, the cardinal rule of statutory interpretation, the primary source of which is the language of the statute itself. *In re Criminal Investigation No. 1–162,* 307 Md. 674, 685, 516 A.2d 976 (1986); *State v. Intercontinental, Ltd.,* 302 Md. 132, 137, 486 A.2d 174 (1985); *Bd. of License Comm'rs of Carroll County v. Pizza Hut of Md., Inc.,* 95 Md.App. 291, 301, 620 A.2d 953 (1993); *Gray v. Anne Arundel County,* 73 Md.App. 301, 309, 533 A.2d 1325 (1987). The Court of Appeals pointed out in *Kaczorowski v. City of Baltimore,* 309 Md. 505, 525 A.2d 628 (1987), that we must first look to the words of the statute "because what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal." *Id.* at 513, 525 A.2d 628. But if the statutory language is susceptible of more than one meaning and thus is ambiguous, courts should consider "not only the literal or usual meaning of words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment." *Id.* at 513, 525 A.2d 628, (quoting *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986)). *Kaczorowski* further demonstrates that, in the rare case in which it is apparent to the court that plain, clear, and unambiguous language in the statute does not express or carry out the intent of the legislature, the legislative intent as discerned by the court will prevail over the plain meaning of the words of the statute.

Judge Robert M. Bell, then writing for this Court in *Ford Motor Land Dev. v. Comptroller of the Treasury*, 68 Md.App. 342, 511 A.2d 578, *cert. denied*, 307 Md. 596, 516 A.2d 567 (1986), also chronicled the rubrics that we follow in our approach to the kind of task at hand:

> " 'Where the language [of the statute] is clear and free from doubt the Court has no power to evade it by forced and unreasonable construction.' Thus where 'there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly.' Furthermore, the statute must be construed considering the context in which the words are used and viewing all pertinent parts, provisions, and sections so as to assure a construction consistent with the entire statute. And, if there is no clear indication to the contrary, a statute must be read so that no part of it is 'rendered surplusage, superfluous, meaningless, or nugatory.' On the other hand, we 'shun a construction of the statute which will lead to absurd consequences,' or 'a proposed statutory interpretation if its consequences are inconsistent with common sense.' "

68 Md.App. at 346–47, 511 A.2d 578 (citations omitted) (emphasis in original). *See also Chesapeake Indust. Co., v. Comptroller of the Treasury*, 331 Md. 428, 440, 441, 628 A.2d 234 (1993).

In those instances where the applicability of a tax statute is being construed, the established rule is "not to extend the tax statute's provisions by implication, beyond the clear import of the language used, to cases not plainly within the statute's language, and not to enlarge the statute's operation so as to embrace matters not specifically pointed out. In case of doubt, tax statutes are construed 'most strongly against the government, and in favor of the citizen.' " *Comptroller of the Treasury v. John C. Louis Co.*, 285 Md. 527, 539, 404 A.2d 1045 (1979) (citations omitted). With all of these principles in focus, we set about our task.

Appellate courts at all levels often consult dictionaries as an aid in their analysis of the meaning to be given legislatively-selected words or phrases in statutes. *See, e.g., State Dep't of Assessments and Taxation v. Consumer Programs, Inc., supra,* 331 Md. at 72–73, 626 A.2d 360. Many times the reason for the choice of the particular dictionary, or the particular edition thereof, goes unexplained explicitly and is not readily ascertainable by implication from the context of its use. Why a particular edition of a particular dictionary illuminates the "natural and ordinary significance" of the word or phrase being scrutinized is a legitimate question any Maryland reader might pose. It seems no court is immune to criticism for a failure to justify this step in its analysis. *See* David O. Stewart, "By the Book", *ABA Journal,* July 1993, at 46–47.

The admissions tax was first enacted in Maryland in 1936 with the addition of § 73 to Article 56 of the Code.[6] That enactment contained the operative phrase "gross receipts" as the basis for computation of the tax. It seems logical, at least in a linear way, that a popular dictionary of that time would be an informative resource in attempting to arrive at a determination of what the 1936 Legislature intended by the usage of "gross receipts."

We have consulted *Webster's Collegiate Dictionary* (5th ed., 1936). It was based on the unabridged parent work, *Webster's New International Dictionary* (2d ed., 1934). As an abridged dictionary, the *Collegiate Dictionary* would likely be in greater use in the general population than its unabridged parent and, therefore, reflect and perpetuate a broader-based understanding of its words and phrases. The adjective "gross" is addressed there as a multisense word. The dictionary's general scheme for the order of definitions is that of the historical order of development of the meanings of a word. Discarding archaic meanings and those obviously inapplicable to the context of a taxing statute, the only sense of "gross" that could be germane to our inquiry is: "[w]hole; entire; total; of earn-

---

6. 1936 Md.Laws ch. 10, § 3.

ings, etc., without deductions;—opposed to *net.*" *Id.* at 440. Turning to "receipt," we learn that the first applicable sense of that noun is: "[t]hat which is received in distinction from what is expended;—usually in *pl.*; as, the gross *receipts.*" *Id.* at 829.

As an additional, corroborative resource we looked to *Black's Law Dictionary* (3rd ed. 1933), the edition then current and in use in 1936. While it may be a matter of rote for many courts to consult *Black's,* we do so here on the assumption that it may be a valid touchstone because, historically, many legislators, and those who assist them in drafting legislation, have been trained in the law and may also have found it to be a logical reference. The senses of "gross" found there, that appear applicable to the context of the statute in question, include: "[a]bsolute or entire . . . [b]efore or without diminution or deduction, total." *Id.* at 858. The only sense of "receipt" offered in *Black's* that could arguably apply here is ". . . the act or transaction of accepting or taking anything delivered." *Id.* at 1501.

As a check against possible changes over time in the sense of the key words at issue, we have also consulted the contemporary lineal descendants of these two dictionaries. *Merriam–Webster's Collegiate Dictionary* (10th ed. 1993), the explanatory notes and other prefatory material of which affords an excellent outline for why and how we, as an English speaking people, use dictionaries, offers as the only relevant adjectival sense of "gross": "consisting of an overall total exclusive of deductions <worth>—compare GROSS." *Id.* at 780. Finally, we found that "receipt," although the relevant senses of the noun have changed somewhat, retained the character of the 1936 definition: "the act or process of receiving: something received—usu. used in pl." *Id.* at 975. Our final lexical, corroborative survey was of *Black's Law Dictionary* (6th ed. 1990). The relevant senses of "gross" and "receipt" do not vary appreciably from those found in its 1933 forebearer. Of particular note, however, is the addition of definitions of the phrases "gross receipts" and "gross income tax," made pertinent as follows:

**Gross receipts.** The total amount of money or the value of other considerations received from selling property or from performing services. *New Mexico Enterprises, Inc. v. Bureau of Revenue,* App., 86 N.M. 799, 528 P.2d 212, 213. *See also* Gross income.

**Gross receipts tax.** *See* Gross income tax.

**Gross income tax.** Levy on total receipts of business without allowance for expenses and deductions. Any tax imposed on gross receipts; may include retail sales tax and general sales tax.

*Black's Law Dictionary* 703 (6th ed. 1990).

From this foray into the world of lexicographers, we conclude that the natural and ordinary significance of "gross receipts" as used in the context of the Maryland admissions and amusement tax statute, both in 1936 when it was enacted originally and today, provides no room for reasonable argument that it contemplates deductions or adjustments for expenses, partner/co-venturer reimbursements, or trade discounts before calculation of the tax due. We conclude further that there is no need for further investigation of appellant's references to foreign authority or its arguments by analogy to other taxing situations. Where "there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly." *City of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174 (1984). Without straying too far from this corollary to the cardinal rule of statutory construction, we find secondary support to buttress our conclusion that the statute is clear and unambiguous in the administrative practice of the Comptroller and a particular act of the General Assembly in 1983.

■ "It is well settled that the unvarying construction of a law by the agency charged with its enforcement over a long period of time is entitled to great weight and should not be disregarded except for the strongest and most urgent reasons." *State Dep't of Assessments & Taxation v. Greyhound Computer Corp.,* 271 Md. 575, 589, 320 A.2d 40 (1974) (cita-

tions omitted). In determining how much weight to be accorded any administrative interpretation or practice, we consider a number of factors, such as: (a) the consistency of the interpretation or practice with the purposes of the statute; (b) the thoroughness, breadth, and validity of the considerations underlying the interpretation or practice; and, (c) the consistency and length of time the interpretation or practice has been in play. *Comptroller of the Treasury v. John C. Louis Co.,* 285 Md. 527, 544–45, 404 A.2d 1045 (1979).

■ Thomas Taylor, Assistant Director of the Sales and Use Tax Division and former Assistant Director of the Admissions and Amusement Tax Division of the Comptroller's Office, testified as follows before the Tax Court:

Q. Does the Comptroller's office have a policy with regard to how gross receipts from coin operated amusement devices are to be calculated for admissions and amusement tax purposes?

A. Yes, they do.

Q. And what is that policy?

A. The gross receipts are the—every penny that is brought in by whatever category or whatever activity is taking place, with no deductions.

Q. No deductions for?

A. Expenses or anything.

Q. And how long has that policy been in effect?

A. Ever since I was with the division, 19—I went there in 1969 and it's been that way ever since.

Q. And what was the policy—strike that. Has there ever been any different policy with regard to the calculations of admissions—of gross receipts from coin operated amusement devices?

A. No, there has not.

Mr. Taylor further explained that the Comptroller disseminates its policies to taxpayers through at least two printed vehicles, bulletins and the tax return forms themselves. As to the latter, the Comptroller introduced in evidence before the

Tax Court Rossville's completed admissions and amusement tax reports for the months of July 1982, October 1983, and January, May, and November 1984. The 1982 specimen bore the prominent printed message that the tax "IS IMPOSED UPON GROSS AND NOT NET RECEIPTS. DO NOT DEDUCT ANY OPERATING EXPENSES, INCLUDING ANY PRIZE EXPENSES FOR GAMES OF ENTERTAINMENT, BEFORE CALCULATING THE TAX." The October 1983 and May 1984 tax reports, in the same location as the previous note on the 1982 report, stated: "OWNERS OF VIDEO AND PINBALL MACHINES ARE LIABLE FOR THE APPLICABLE TAX ON THE ENTIRE GROSS RECEIPTS WITHOUT ANY DEDUCTIONS WHATSOEVER FOR ANY SHARE OF THE GROSS RECEIPTS PAID TO ANY LOCATION OWNER OR OPERATOR." The other 1984 forms offered in evidence contained a modified note to the taxpayer that read: "THE ADMISSIONS TAX IS IMPOSED UPON GROSS AND NOT NET RECEIPTS. EXCEPT FOR THE COST OF BINGO PRIZES IN ANNE ARUNDEL COUNTY, NO DEDUCTIONS FOR ANY EXPENSES OR PAYMENTS TO ANY PERSON FOR ANY REASON IS PERMITTED." Taylor traced the Anne Arundel County exception identified in the two 1984 forms to legislation enacted by the General Assembly in 1983 which exempted from "gross receipts" winnings paid by legalized commercial bingo operations in Anne Arundel County.[7] Such an amendment would have been necessary to carve the exception because either, or both, the statute clearly and unambiguously otherwise included such payouts within "gross receipts" or the Comptroller's prior interpretation of, and practice with regard to, "gross receipts" otherwise allowed no such exemption. Either predicate costs Rossville in the instant case. The former reason is obvious. The latter admits of the General Assembly's knowledge of the Comptroller's interpretation in only adopting the limited exception fashioned in the 1983 amendment to the statute. This adds weight to the

---

7. 1983 Md.Laws ch. 161 enacted § 402(d), art. 81, Md.Code Ann.

persuasiveness of the Comptroller's interpretation as one in which the legislative body has apparently acquiesced.

Rossville's main attack on the consistency of the Comptroller's interpretation focuses on a perceived disparity between policy and reality in its treatment of games of chance called "Big Six Wheels." Appellant essentially argues that, despite Watts's and Taylor's assertions that the Comptroller expects the operators of such devices to account for "every penny that went across the board" and pay the tax based on such "gross receipts," without deductions for prize monies or the cost of non-monetary prizes, the Comptroller had failed to enforce that policy as to such operators, fostering a situation where the rule was more honored in the breach than the observance. Rossville's argument is attenuated, however, by the fact that the tax reporting shortcomings of the Big Six Wheel operators, who do not seem to be nearly the business record keepers that appellant is, cannot be fairly attributed to the Comptroller. In short, Rossville has failed to erode the confidence we, the circuit court, and the Tax Court, repose in the longstanding, consistent administrative interpretation and practice demonstrated on this record.

Guidance from Maryland case law is slight with regard to the issue at hand. The Court of Appeals addressed the meaning of "gross receipts" in the context of the corporate franchise tax in *State v. Central Trust Co.*, 106 Md. 268, 67 A. 267 (1907). The question posed by *Central Trust*, in the Court's words, was "whether ... the Legislature intended to tax each member of certain designated classes of corporations at one specified rate on all of its receipts, or to tax it on segregated portions of its receipts at different rates according to the kind of business from which they respectively came." *Id.* at 272, 67 A. 267. The particular facts of *Central Trust* required the Court to determine whether "gross receipts" included the earnings from certain other businesses (real estate investments and trading in the stocks and bonds of other corporations) conducted in Maryland by that taxpayer as well as from those businesses for which it had been legislatively chartered in Maryland (safe deposit, trust, guarantee, and

fidelity companies). This presented, therefore, the problem of ascertaining the categorization of the types of corporations covered by the statute in question. The Court did not find it necessary to define "gross receipts" in the context of that taxing statute.

The only other case worthy of comment, as urged upon us by appellant, is *Scoville Serv., Inc. v. Comptroller of the Treasury,* 269 Md. 390, 306 A.2d 534 (1973). Scoville leased the parking lot around Laurel Raceway and operated the parking concession there for track patrons. The charge made by Scoville to park entitled the payor merely to park his or her car. An additional and separate admission charge to the track was collected by the track operator after the patron had parked his or her car. The Comptroller collected the admissions tax on Scoville's receipts and denied a refund request for its return. The Court of Appeals accepted Scoville's argument that its charges were for the privilege of parking only, and not a part of the price of admission to the track. The Court, in construing whether Scoville's receipts were part of the "gross receipts" charged for "admission within an enclosure in addition to the initial charge for admission to such enclosure" (Md.Ann.Code art. 81, § 402(2)), focused its analysis on the word "admission," not the phrase "gross receipts." Thus, while the effect of the Court's holding may have been to exempt Scoville's collections from the "gross receipts" to which the Comptroller looked for the calculation of the overall admissions tax from the operation of the racetrack, it lacks persuasive weight in the case *sub judice.*

Courts in other states, confronted with a similar issue, have applied a similar methodology and achieved a comparable result. *See e.g., TLR, Inc. v. Town of La Center,* 68 Wash. App. 29, 841 P.2d 1276, 1278 (1992) (definition of "gross receipts" appearing in *Black's Law Dictionary* 633 (5th ed. 1979) adopted as unambiguous, plain meaning of phrase as it appeared in State enabling legislation and municipal taxing ordinance concerning punch board and pull-tab gambling devices); *County of Sacramento v. Pacific Gas & Elec. Co.,* 193 Cal.App.3d 300, 309–10, 238 Cal.Rptr. 305, 311–12 (1987)

("gross annual receipts," as contained in State statute authorizing counties to charge franchise tax on gas and electric utilities who use public streets to transmit service, accorded plain meaning divined from definitions of individual words comprising the phrase as found in *Webster's New Collegiate Dictionary* (G. & C. Merriam Co., 1981) and from the definitions of the complete phrase offered in *Black's Law Dictionary* (5th ed. 1979) and *Ballentine's Law Dictionary* (3d ed. 1969); overall total, exclusive of deductions, of money or value of other considerations actually received); *See also Sheriff v. Moore,* 105 Ga.App. 833, 125 S.E.2d 729 (1962) ("gross receipts," as used in an insurance contract that otherwise failed to define the phrase, is an unambiguous term meaning "the whole, entire receipts, as opposed to net receipts ... and under ordinary basis methods of handling accounts the term must be taken to include the whole total gross receipts without any deductions"); *Taylor v. Rosenthal,* 308 Ky. 4, 213 S.W.2d 435, 437 (1948) ("when a tax is levied on 'gross receipts' it applies to every penny a person, firm or corporation takes in regardless of the source from which it comes"); *Savage v. Commonwealth,* 186 Va. 1012, 45 S.E.2d 313, 316–17 (1947) (term "gross receipts" in State statute taxing contract and common carriers meant "whole, entire, total receipts").

Lastly, we comment that we find no merit in appellant's arguments as to the right of control, or entitlement to, the quarters inserted in its machines. We consider the partnership/joint venture nuance of Rossville's asserted relationship with the establishment owners superfluous to the issue before us. When a player inserted a quarter in a Rossville video poker machine, the "gross receipts" threshold contemplated by the plain meaning of the statute was crossed and the course of consensual, private business dealings cannot alter that inexorable effect. If the Legislature had intended there to be any deductions or adjustments to "gross receipts," whether for equitable or other reasons, it knew how to do that. *See* n. 7, *supra.* It has not, except as noted earlier.

The arguments of the parties to this appeal highlight the traditional distinction between *denotation*—the direct and spe-

cific part of meaning that is sometimes indicated as the total of all the referents of a word and is shared by all or most people who use the word—and *connotation*—the more personal associations and shades of meaning that gather about a word as a result of individual experience and that may not be widely shared. In cases of statutory construction, we mainly concern ourselves with the denotation of words.

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**