REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 825

September Term, 2014

_____

JOHN ZORZIT, ET AL.

v.

COMPTROLLER OF MARYLAND

_____

Krauser, C.J.,
Graeff,
Nazarian,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  October 1, 2015

\* Judge Kevin F. Arthur did not participate,
pursuant to Md. Rule 8-605.1, in the Court's
decision to report this opinion.

John Zorzit and Nick's Amusements (collectively, "Nick's") were ordered to pay $5,770,353.18 by the Maryland Tax Court—$2,159,724.97 in unpaid admissions and amusement taxes, interest on those taxes, and a fraud penalty of $1,079,862.45. Nick's does not dispute failing to pay taxes, but contests the amount owed and disagrees with the fraud penalty. It argues that the Comptroller's assessment that was the basis for the Tax Court's Order was fatally flawed and that the Comptroller failed to prove the necessary intent to defraud. We disagree with both arguments and affirm.

## I.    BACKGROUND

From 1993 until 2009, Mr. Zorzit owned and operated Nick's Amusements. Nick's provided coin-operated entertainment machines to bars and restaurants, including jukeboxes, pool tables and video poker machines. Nick's retained ownership of the machines, and split the profits with the owner of the venue. With video poker machines, owners and managers of the locations made cash payouts to winning customers, with Nick's knowledge and approval, and these payouts were deducted from the profit they split. Nick's concedes that these payouts were illegal. Moreover, Nick's kept no records of the payouts—indeed, as counsel for the Comptroller suggested at the Tax Court, keeping records would have been recording a criminal enterprise.[1]

---

[1] *Cf. The Wire*: Straight + True, Season 3, Episode 5:
> STRINGER BELL: [W]hat is that?
> SHAMROCK: Robert Rules say we gotta have minutes for a meeting, right? These the minutes.
> STRINGER BELL: [I]s you taking notes on a criminal . . . conspiracy?

Nick's was charged criminally as a result of the video poker business many times. Mr. Zorzit testified that prior to 2009, Nick's was a defendant in more than fifteen cases in the Circuit Court for Baltimore County, but none of these ever yielded a conviction. He claimed, in fact, that there was an understanding between Nick's and the former State's Attorney for Baltimore County:

> MR. ZORZIT: If [Baltimore County Police saw gambling], they'd come back, [get] a search warrant, come in there with 20 people. Go through the machines, call us up and say we got your machines, can you come over and open them up. We'd come over and open them up so they didn't bust them. And it was very cordial with everybody. They had my cell number . . . .
>
> As soon as they would tell us, you know, what location [from which police were seizing machines], the truck would go over there with some more new ones because they were going to take those out. So the truck would be sitting there. They would be wheeling the machines that they have out, and we'd be wheeling the new ones in, and that's since I was a kid.
>
> THE COURT: Okay.
>
> MR. ZORZIT: And then we go to court, and [our attorney] Arnold Zerwitz, I know he testified 12 to 15 times. I think it was a little more than that. We'd go to work. It's already worked out before we go in. The prosecutor . . . for years said I'm not prosecuting these things. This is ridiculous.

It is, of course, lawful to operate video poker machines *without* making payouts, at least so long as the machines are properly licensed and taxes are paid. *See* Md. Code (1992, 2010 Repl. Vol.), §§17-405, 17-408, and 17-414 of the Business Regulation Article. Video poker machines and other "games of entertainment" are subject to an "admissions and

2

amusement" tax of 10% in Baltimore County. Baltimore County Code §11-4-601. Although counties impose these taxes, businesses are required to remit admissions and amusement taxes to the Comptroller. Md. Code (1988 Repl. Vol. 2010), §§2-109, 4-201, 4-301 of the Tax General Article ("TG").

Nick's helped its Baltimore County customers obtain licenses for their video poker machines and collected the taxes.[2] After the machines were installed and running, Nick's "route men" visited each location, opened the machines, counted the cash, calculated the admission and amusement taxes to be paid on the revenue at that location, and, then-and-there, split the profits with the location's owner.

But Nick's did not consider illegal payouts to be taxable, and the route men did not include payouts when calculating Nick's tax liability. What's more, Nick's route men did not keep records that would allow anyone to calculate the taxes due on payouts. *First*, the route men kept no records of payouts at all. *Second*, they did not record revenue on a per-machine basis—they tallied all of the revenue by location, net of payouts, and wrote down only that total before calculating taxes and license fees, and splitting the profits. Thus, when a route man returned to Nick's office with the day's receipts, video poker revenue was indistinguishable from revenue from jukeboxes, pool tables, or any other cash revenue.

---

[2] It is worth noting too that of the approximately forty to fifty bars and restaurants where Nick's had placed video poker machines by 2009, Mr. Zorzit and a business partner owned the building at thirty through a separate company.

Beginning in 2006, the Baltimore County Police Department ("County Police") conducted a wide-scale investigation of Nick's video poker operations. After significant undercover work and speaking with informants, the County Police seized eighty-three video poker machines owned by Nick's from twenty-nine locations on January 28, 2009.[3] Police opened the machines and analyzed their motherboards in an effort to determine how much money was paid into the machines and how much had been won (the "in-credits" and "out-credits," respectively). County Police officers later called to testify conceded that bar and restaurant owners likely did not pay out every credit won,[4] and that if Nick's had purchased used machines, the in- and out-credits from previous owners would still be recorded on those machines. But having no way to distinguish between previous out-credits and out-credits during Nick's ownership of machines, the County Police compiled the raw data from these motherboards into a report, and turned that report over to the Comptroller's Office.

The Comptroller independently analyzed the report. The Comptroller at no time took possession of or tested the machines. Using the figures from the motherboards, the

[3] Police also conducted a raid of Nick's offices, where they found over $41,000 in cash, including $26,000 in a plastic bag in the ceiling.

[4] Sergeant Thomas Hench conceded in general terms that every out-credit does not result in a payout, but did not testify that he ever saw a bar or restaurant owner in the Nick's network fail to pay an out-credit, and insisted that all out-credits on Nick's machines led to a payment.

4

Comptroller's Office devised a "payoff percentage," representing the percentage of out-credits to in-credits. The Comptroller assumed that every out-credit was paid, and ultimately hypothesized that 55% of the money paid into a machine would be paid back to customers.[5] The Comptroller then applied this figure to the gross revenue that Nick's had recorded for the period of August 2003 to January 2009. Nick's had not retained records for January 2000 through July 2003, so the Comptroller devised a monthly average return for the 2003-2009 period, used that number for the months without records, then applied the payoff percentage.[6] After estimating the amount of money bar and restaurant owners had paid out over the years, and applying a 10% admissions and amusement tax rate, the Comptroller ultimately arrived at a tax deficiency of $2,159,724.97 for the 2000-2009 period. The Comptroller then added interest on the outstanding tax bill and imposed a 100% fraud penalty.

Mr. Zorzit later testified that after the raid, he sought access to the video poker machines from the County Police, but his request was denied. Sergeant Thomas Hench of the County Police testified, however, that no one at Nick's asked for access to the machines to conduct their own testing of the motherboards. He also testified that the Comptroller

_____

[5] The Comptroller originally arrived at a payoff percentage of 59% via an "average of averages" method before adopting the 55% figure.

[6] The record does not reveal why liability attached only from January 2000 onward.

never asked for the machines, nor asked the County Police to preserve them, and that after storing the machines for "[a] year or two" they were destroyed.

Nick's appealed the assessment to the Tax Court. It argued that the deficiency assessment was inadequate because the assessment (1) assumed all of Nick's revenue claimed by Nick's came from video poker; (2) used out-credits from the life of the video poker machines when a significant number of Nick's machines had been bought used; and (3) assumed that all out-credits represented payouts even though bar and restaurant management often would not pay and repairmen might accumulate out-credits while testing the machines. At the hearing, Nick's offered testimony from Ben Cummings, one of Nick's route men,[7] who estimated that only 65% of Nick's revenues came from video poker, and that the payoff percentage was between 20 and 25%. Nick's also offered expert testimony from a statistician, who applied Mr. Cummings's numbers to the Comptroller's methodology and calculated a tax deficiency of only $466,016.10. Finally, Nick's disputed the fraud penalty, claiming that neither of the two CPAs they employed, nor their retained attorney, nor anyone else on staff were aware that payouts were taxable, and that Mr. Zorzit and the company lacked the requisite intent to defraud.

The Comptroller in turn called two police officers who had participated in investigating Nick's, Corporal Montgomery and Sergeant Hench. They described their

---

[7] Mr. Cummings, who was thirty-seven years old at the time of testimony, testified that he had worked for Mr. Zorzit in various capacities from the age of 18.

6

investigation and the illegal video poker business in general. The Comptroller also called one of its auditors, Charles Drasher, who testified that Nick's did not maintain records or program the machines in a way that allowed auditors to determine which out-credits resulted in payouts and which did not:

> COUNSEL: If there were statements to the effect that not all out-credits may have resulted in payments, why did the comptroller base the assessment on all of the out-credits that were made?
>
> MR. DRASHER: Again, there was no reliable documentation as to what percentage of out-credits represented payouts. And in speaking with Sergeant Hench, he informed me that he believed [] all of the out-credits to be payouts.
>
> COUNSEL: Ben Cummings has provided what he called guesstimates as to the amount of money that came from the non-video poker machines and the number of out-credits that did not result in payouts. Why didn't the Comptroller take his guesstimates into account?
>
> MR. DRASHER: Again, there were no documents, no records to back up any estimates he may have made.

Mr. Drasher echoed the testimony of Corporal Montgomery regarding the relative revenue that came from the video poker machines. He testified that one bar owner in the Nick's network ascribed roughly $50 and $300-$400 per week respectively to pool table and jukebox revenue, but that video poker devices brought in $7,000-$10,000 per week. Mr. Drasher also referred to this Court's decision in *Genie & Company, Inc. v. Comptroller of the Treasury*, 107 Md. App. 551 (1995), and identified the "badges of fraud" that, in the Comptroller's view, supported the fraud penalty.

The Tax Court ultimately found enough evidence of fraud under *Genie* to uphold the fraud penalty. And although the court expressed doubt about the accuracy of the assessment, it adjusted the fraud penalty to compensate:

> What I don't have is sufficient evidence for me to come up with the accurate percentage of how much of the total receipts come from video [poker] machines and how much come from the other sources. I know it's not a hundred percent, and I'm pretty sure it was above 65 percent, but I don't know what it is in between, and I'm not allowed to guess. I need sufficient evidence in the record to come up with a number, and I don't have it.

> The other issue I had to address is the out-credits and how much of them represented payouts. Some testimony was that it was about 25 percent on these, it looks like bartenders playing on the machines after hours, repair people putting credits onto the machines to make sure that they operated correctly. The other end of the extreme was someone who said the amount is inconsequential. Again, I don't have any testimony that gives me the ability to specify a number somewhere between 0 and 25 percent.

> So I will affirm the assessment that I have in front of me since I can't come up with a different number that I feel [confident] is correct. What I will do, though, is I have discretion in terms of the amount of [the] fraud penalty charge, based on the fact that I don't believe the accounting is a hundred percent accurate. As a matter of fact, I'm pretty sure that it's not. I'm going to reduce the fraud penalty to 50 percent, which should cover any illegal accounting by the comptroller's office, as well as allow the fact that, you know, if fraud takes place, I think there should be a penalty.

The Tax Court's order affirmed the $2,159,724.97 assessment, charged interest through July 31, 2013 totaling $2,530,765.72, "which interest shall accrue until the

8

assessments are paid off in their entirety," and assessed a reduced fraud penalty in the amount of $1,079,862.45.

Nick's filed a Petition for Judicial Review on August 13, 2013 in the Circuit Court for Baltimore County. The court heard argument on April 24, 2014, and on June 5, 2014, filed a Memorandum Opinion affirming the Tax Court's decision. Nick's filed a timely Notice of Appeal.

## II.   DISCUSSION

Nick's presents two questions for our review:

1. Whether the Tax Court erred in imposing a civil fraud penalty without finding intent to evade payment of a tax known to be owed within the meaning of [§]13-703 of the Tax—General Article; and

2. Whether the Tax Court erred in affirming the Comptroller's assessment when the assessment was based upon inarguably and admittedly erroneous assumptions and other evidence that the Comptroller failed to preserve.

Nick's argues that the Tax Court erred in assessing a penalty for civil fraud. It claims that neither the company nor its employees nor its professionals knew that the company owed tax on payouts, and that the Tax Court found as much. It argues that this ignorance belies any intent to evade payment of the tax, and without that intent, there can be no finding of fraud. Nick's also argues that the Comptroller has assessed an admittedly erroneous amount against them—exacerbated by his failure to preserve the motherboards—and that the Tax Court must be reversed for affirming the assessment.

9

The Comptroller counters that the Tax Court properly assessed a fraud penalty under the holding of *Genie*. He further argues that substantial evidence supports the assessment, and draws our attention to the fact that a fully accurate assessment was impossible because Nick's failed to maintain adequate records. The Comptroller claims that the statutory scheme empowered him to "estimate the tax owed by Nick's using the limited documents and data that were available," and he asserts that he "did [his] best to come up with a reasonable estimate under the circumstances." The Comptroller argues finally that he cannot be penalized for the destruction of the motherboards because he never possessed or even inspected them.

We hold that the assessment was reasonable, that there were sufficient badges of fraud to sustain the Tax Court's fraud penalty, and that the Comptroller should not have been sanctioned for the destruction of the motherboards.

We undertake a "severely limited" review of Tax Court decisions. *Comptroller of the Treasury, Income Tax Division v. Diebold, Inc.*, 279 Md. 401, 407 (1977).[8] We give great deference to the Tax Court's fact-finding, and "great weight to the Tax Court's interpretation of the tax laws, but review its application of the case law without special deference." *State Dep't of Ass't & Taxation v. Andrecs*, ___ Md. ___, 2015 WL 4988207 at *9 (August 21, 2015) (citations omitted).

---

[8] We look through the decision of the circuit court and review the decision of the Tax Court directly. *Comptroller of the Treasury v. Johns Hopkins University*, 186 Md. App. 169, 181 (2009).

For its part, Nick's appears to take no issue with the Tax Court's fact-finding as such, but instead challenges the adequacy of the record to support the Tax Court's findings and its legal authority to assess taxes and impose penalties in the face of evidentiary gaps.

### A.  *Rossville Vending* **Is Controlling.**

It is rare that a claim of "tax confusion" can be refuted so thoroughly, let alone by a reported decision of an appellate court old enough to drink alcohol or gamble in a casino. This is just such a case.  In 1993—three years before Nick's was incorporated—we decided *Rossville Vending Machine Corp. v. Comptroller of the Treasury*, 97 Md. App. 305 (1993), a case that involved the admissions and amusement tax liability of a nearly identical Baltimore County-based video poker business:

> Rossville owned a number of video poker machines that it placed in bars, restaurants, and other establishments frequented by the general public (collectively referred to hereafter as "establishments" or singularly as "establishment"). The machines were activated by patrons placing quarters in them. A player accumulated "points" or "credits" as he or she played and got winning poker hands. When the player accumulated sufficient "credits" or "points," he or she would be paid winnings in cash directly by the owner, or owner's employee, of the establishment (not Rossville), based on the player's number of accumulated "credits" or "points." It was conceded that such payouts constituted violations of Maryland's anti-gambling laws.
>
> Rossville's financial arrangements with each owner of an establishment included a fifty-fifty split of the revenues received from the play of the machines in that establishment, after reimbursement for the owner's winnings payouts and deduction of expenses such as fees and taxes.

11

*Id.* at 307. Unlike Nick's, however, Rossville Vending received documentation of payouts from the bar and restaurant owners, and reflected the payouts in its internal accounting. *Id.* at 307-8.

Ultimately, the County Police investigated Rossville and raided its offices and various establishments where Rossville had installed video poker machines. *Id.* at 308. The County Police seized Rossville's accounting records, and turned them over to the Comptroller's office. *Id.* And although Rossville had paid taxes on profits from the machines, the Comptroller took the position that payouts to customers were also taxable, and levied a deficiency assessment against Rossville. *Id.* at 308-9.

Rossville appealed to the Maryland Tax Court, and the Tax Court affirmed the assessment. *Rossville*, 97 Md. App. at 310. Ultimately, so did we. We explained that the admissions and amusement tax statute has "contained the operative phrase 'gross receipts' as the basis for computation of the tax" since it was enacted in 1936, *id.* at 316, and that the plain meaning of the statute imputed tax liability for payouts:

> [W]e conclude that the natural and ordinary significance of "gross receipts" as used in the context of the Maryland admissions and amusement tax statute, both in 1936 when it was enacted originally and today, provides no room for reasonable argument that it contemplates deductions or adjustments for expenses, partner/co-venturer reimbursements, or trade discounts before calculation of the tax due. We conclude further that there is no need for further investigation of appellant's references to foreign authority or its arguments by analogy to other taxing situations. Where "there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly."

*Id.* at 318 (quoting *City of Baltimore v. Hackley,* 300 Md. 277, 283 (1984)).

Nick's concedes that illegal payouts were made on its video poker machines and that it did not pay taxes on those payouts. Nick's also does not dispute that *Rossville* is binding here, and by implication, it does not appear to dispute that it owes *some amount* of taxes. Instead, Nick's pleads ignorance: it claims that despite Mr. Zorzit's personal relationship with the owners of Rossville Vending and knowledge of that business, no one at Nick's, nor its experienced attorney, nor its experienced accountant knew that *Rossville* was on the books until the Comptroller levied this assessment. As a result, it claims, neither Nick's nor Mr. Zorzit had or could have formed the intention to withhold taxes. *Second*, Nick's takes issue with the Comptroller's computation of tax liability, and argues that the Tax Court should have adopted their much lower estimate of the amount owed.

**B.    Substantial Evidence Supports The Tax Court's Finding That Nick's Committed Fraud.**

Both the Comptroller and Nick's argue that *Genie & Co.* controls the question of whether Nick's can properly be found to have committed fraud. Both are correct in that regard. *Genie* concerned a diesel fuel distributor. *Id.* at 554. At the time the case was decided, diesel fuel that was used for transportation was taxed at a higher rate than diesel fuel used for other purposes. *Id.* at 555. Although the retail purchaser of the diesel fuel usually paid the tax, the statute required distributors like Genie to collect, report, and remit the tax. *Id.*

13

The Comptroller investigated Genie's operations and determined that over the relevant time period, Genie had failed to collect roughly half of the taxes for which it was responsible. *Id.* at 557-58. The investigation demonstrated that Genie had essentially made inappropriate, tax-free sales to five large commercial customers. *Id.* at 558-59. Genie ultimately conceded as much, but argued to the Comptroller, and subsequently at the Tax Court, that it had held a good-faith-but-mistaken belief that these customers were tax-exempt. *Genie*, 107 Md. App. at 559. The Comptroller, in addition to levying an assessment for the unpaid taxes, had imposed a penalty for fraud. *Id.* at 558. Genie argued at the Tax Court, the Circuit Court, and eventually in this Court, that the penalty was erroneous as a matter of law because Genie lacked the requisite intent to defraud the Comptroller. *Id.* at 564.

We, along with the Tax Court and Circuit Court, affirmed the fraud penalty. Noting that "the elements of tax fraud . . . are seldom confessed by the accused party," we held that "[d]irect evidence that fraud was committed is not necessary; rather, it is more often inferred by circumstantial evidence." *Id.* at 567. Because of the paucity of Maryland case law on the issue at that point, we imported the federal "badges of fraud" doctrine,[9] and identified seven factors to guide courts in assessing the circumstantial evidence of fraud:

---

[9] *Genie* cited *Alexander Shokai, Inc. v. Commissioner*, 34 F.3d 1480 (9th Cir. 1994), *Day v. Commissioner*, 975 F.2d 534 (8th Cir. 1992), *Douge v. Commissioner*, 899 F.2d 164 (2d Cir. 1990), *Laurins v. Commissioner*, 889 F.2d 910 (9th Cir. 1989), *Scallen v. Commissioner*, 877 F.2d 1364 (8th Cir. 1989), and *Korecky v. Commissioner*, 781 F.2d 1566 (11th Cir. 1986). *See Genie*, 107 Md. App. at 568-69.

14

The badges, indicia, or factors to look for in the tax fraud context include:

(1) consistent and substantial understatements of income (or sales, in the sales tax arena);

(2) failure to maintain adequate records;

(3) implausible or inconsistent explanations of behavior, including the lack of credible testimony before a tribunal;

(4) concealment of assets;

(5) failure to cooperate fully with tax authorities;

(6) awareness of the obligations to file returns, report income or sales, and pay taxes; and

(7) failure to file returns.

*Id.* at 568. Importantly, we held that "no one badge or factor should be given excessive weight" and that it was "not [] required that a specified number of badges be present to invoke the statute." *Id.* at 569. And on the record in that case, we held that substantial evidence supported the Tax Court's finding that Genie had committed at least four badges of fraud. *Id.* at 570.

We reach the same conclusion here. Not only is there substantial evidence to find badges one, two, and four in this case, but the presence of these badges is conceded. In the unique world of video poker devices, "in-credits" are the equivalent of sales, and every witness for Nick's who was asked the question testified that Nick's kept no records of gross revenue on the machines. Because Nick's failed to keep records of gross revenue, it obviously failed to report sales to the Comptroller, thereby satisfying badges one and

15

two.  Although Nick's witnesses never referred explicitly to these activities as "concealment of assets," each testified that he knew the payouts were illegal.  The logical conclusion is obvious: payouts (and thus gross revenue) were concealed to avoid criminal liability.  If that were not enough to constitute concealment of assets, then certainly Nick's accounting methods—recording only the net income by location rather than breaking down machine by machine—supports a finding that Nick's intended to conceal revenue as it came in.

The Tax Court found that each of these three badges had been proven, and added badge number six: awareness of the obligation to file returns, report income or sales, and pay taxes.  Nick's does not contest its awareness of its obligation to pay taxes, but professes somehow not to have known that it owed admissions or amusement taxes on gambling payouts.  The Tax Court did not find in so many words that Nick's witnesses were lying, but did find their ignorance of the law to be awfully convenient, if not purposeful:

> There was a lot of testimony about what [Nick's] knew about the obligation to pay taxes on the payouts and [Mr. Zorzit's] conversation, or lack of conversations with the CPA and internal accountant.  It appeared to me that this was a subject that was never discussed.  I did not get the impression that Mr. Zorzit ever specifically asked Mr. Friedman [Nick's outside CPA] or his own accountant, 'Do I owe admissions tax on these payouts?' in part because they were illegal and part, I guess, because he never gave it a lot of thought.  So neither of them did any explicit research into whether or not there was an obligation to collect and remit taxes.

16

Nick's argues that this passage represents a finding by the Tax Court that the company lacked intent to defraud. We disagree. At best—and this is a stretch—the Tax Court could be read as finding that Nick's opted not to research (or have its professionals research) its liability for taxes on illegal gambling income. This sort of willful blindness is close enough, especially given the deferential standard we apply to Tax Court decisions.

In fact, Nick's own witnesses revealed a sophisticated operation engineered to generate uncertainty and deflect blame. Nick's installed video poker machines at locations that, as often as not, Mr. Zorzit owned. Nick's facilitated the licensing process. The company knew that bar and restaurant owners were making payouts, and Nick's profited directly (and handsomely) from that business. And Nick's affirmatively failed to keep any records of this revenue. Nick's touts the decades of experience that its accountants and attorney have in this field, but expected the Tax Court to believe that these seasoned professionals had no knowledge of a twenty-plus-year-old, totally-on-point appellate decision—and now asks us to hold as a matter of law that the Tax Court lacked substantial evidence to reject Nick's ignorance defense. The Tax Court didn't need to find in so many words that Mr. Zorzit or Nick's or the professionals knew specifically about the *Rossville* case—under *Genie*, it is enough that substantial circumstantial evidence supported this fourth badge of fraud. Combined with the other three badges, we hold that the record before the Tax Court amply supported its finding from circumstantial evidence of intent to defraud, and we affirm the Tax Court's penalty.

17

## C. The Tax Court Did Not Err In Adopting The Comptroller's Assessment.

The Tax General Article authorizes counties to impose admissions and amusement taxes, TG §4-102, and requires the Comptroller to collect those taxes. TG §2-109. Parties subject to the tax must file returns with the Comptroller, TG §4-201, and must ensure that those returns are accurate. TG §4-202. The Tax General Article anticipates, however, that some parties will not keep accurate records, and empowers the Comptroller to assess taxes in these situations:

> (a) If a person or governmental unit fails to keep the records required under § 4-202 of this article, the Comptroller may:
>
>> (1) compute the admissions and amusement tax by using a factor that the Comptroller develops pursuant to subsection (c) of this section; and
>> (2) assess the tax due.
>
> ***
>
> (b) The factor utilized by the Comptroller pursuant to this section shall be developed by:
>
>> (1) a survey of the business of the person or governmental unit, including any available records;
>> (2) a survey of other persons or governmental units engaged in the same or similar business; or
>> (3) other means.

TG §13-403. No case has clearly addressed the limits of the phrase "other means." But this case does not require us to engage in an extended exercise in statutory construction.

18

"If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Walzer v. Osborne*, 395 Md. 563, 572 (2006) (quoting *Jones v. State*, 336 Md. 255, 261 (1994)). It is true that the plain meaning must be considered in the context of the statutory scheme as a whole. *See generally Breitenbach v. N.B. Handy Co.*, 366 Md. 467 (2001) (holding the "plain meaning" of a provision was rendered ambiguous, and ultimately, incorrect, by the purpose and context of the broader Act). But "if the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Id.* at 473.

Plainly, use of the term "other means" suggests the legislature intended to vest broad discretion in the Comptroller to calculate assessments against parties that have not kept complete records. Put another way, a taxpayer that fails to fulfill its legal obligation to keep records cannot, by doing so, hamstring the Comptroller from estimating and assessing taxes reasonably.

Everybody agrees, including the Comptroller himself, that his calculations were not perfect. But in the context of this record—or, more precisely, the distinct absence of the relevant financial records—the Comptroller's calculations were supported by substantial evidence. As revenue came in, Nick's actively failed to track the sources of its revenue. The Comptroller was left only with revenue totals, and some evidence to suggest that the vast majority of revenue came from video poker. Indeed, the only bar owner in the Nick's

19

network to speak to the figures told County Police that video poker devices brought in $7,000-$10,000 per week, while the pool table and jukebox brought in only $50 and $300-$400 per week respectively. Without any concrete numbers or records, the Comptroller was not out of line to assume that *all* revenue came from video poker for the sake of assessment.

At the same time, the County Police had seized a large number of machines from Nick's, and analyzed the accounting data contained in their motherboards. The Comptroller took this data, and calculated the amount of illegal payouts that appeared to have taken place. Using these figures—the only records available—the Comptroller calculated Nick's liability as best he could.

We share the parties' rightful concern about the outer limits of the Comptroller's discretion to devise assessment methods, but this case does not present such an extreme question. Nick's asks us to find as a matter of law that the Comptroller *was required* to rely on the uncorroborated guesstimate—his word—of a former employee and friend to calculate the unpaid tax liability over the Comptroller's best estimate. As imprecise as the Comptroller's calculation might be, Nick's alternative would reward exactly the sort of tax-evasive behavior the law is meant to deter and sanction.

In his own words, here is Mr. Zorzit's take on the illegal payouts made to his customers, and Nick's institutional knowledge of payouts:

> Q: Okay. So you knew from day one, even back to [your previous business], that illegal payouts were being made to customers?

A: Absolutely.

***

Q: I want you to describe for the Court why you believe the Comptroller's methodology for calculating tax associated with payouts made by bar owners is incorrect or flawed?

A: Well, it's several things . . . I've never seen their numbers, but, you know, they took their numbers in account for all the reasons why you would knock off plays. There's probably more. But sitting here right this minute, I'm drawing a blank.

***

Q: Okay. My question to you is, did you have any records, or data, that you could have given to the Comptroller for [2000-2003]?

A: In 2009?

Q: Yeah.

A: If we did, we gave it to you, and I don't think we had anything, did we?

Q: Not that I'm aware of.

A: Well, then our office gave everything we had.

***

Q: You didn't keep track of the payouts that you made?

A: That is correct.

Q: Okay. Well, you would agree with me that if you [had] done that, you would be creating records of a criminal enterprise, wouldn't you?

21

A: I didn't even in my wildest dreams think that this is criminal, [Counsel]. When the Comptroller's Office, when the Baltimore County Police Department, when the Baltimore City Police Department—there is nobody hiding nothing.

Q: But Mr. Zorzit, my question is, wouldn't you agree that if you kept records of illegal payouts, you would be creating evidence of a criminal enterprise?

A: I never thought of it that way.

\*\*\*

Q: Okay. And on paragraph c [of Nick's plea agreement with the federal government], under paragraph 3, the elements of offense, paragraph C says that, "the principals of Nick's Amusements knew that the property was derived from criminal activity." And since you were the only principal of Nick's, you are talking about yourself, that you were aware that the property was derived from criminal activity; is that correct?

A: That's what it says.

\*\*\*

Q: Now it sounds as though Nick's has taken the position that not all out-credits that were recorded on some of these video poker machines resulted in payouts. Did you keep any records of how many out-credits would or would not result in payouts?

A: I didn't keep any records, no.

Q: Do you know if the bar owners did?

A: No.

Q: And you didn't require the bar owners to account for [] out-credits and how many payments were made based on how many out-credits?

A: No.

22

Q: Okay. Now Mr. Cummings testified that . . . his estimate, or he called it a guesstimate, of 25 percent [of money paid in would be paid out in winnings] was based on his experience and his observations. Do you know from your own involvement with Mr. Cummings whether he could have based it on anything else, any records, or data or anything like that?

A: Well, there's nobody better than him to base it, because he works with it on a daily basis.

Q: As far as you know, did he have any personal records that he could have looked back on to base that estimate on?

A: He wouldn't have no reference.

To summarize: Nick's ran an illegal gambling operation for years, one that consistently and by design failed to keep records of its criminal activity. Its proprietor, Mr. Zorzit, has no idea how much taxable money was paid out, and the only basis that he offers for changing the Comptroller's assessment—the testimony of Ben Cummings—is corroborated by zero documentation, recordkeeping, or even with additional interested witness testimony. Mr. Zorzit has not even seen the Comptroller's data, so he cannot know what it is that he disagrees with, or by how much. And as his reward for failing to keep adequate records for the last ten years of his business, and failing to retain any records at all for the years 2000-2003, Mr. Zorzit asks us to find that the Tax Court erred as a matter of law by relying on the Comptroller's calculation instead of Mr. Cummings's self-described "guesstimate." If we were to adopt this argument, no rational Maryland company would keep records or file tax returns—instead, they would wait to be caught, and when

23

the Comptroller came around for an audit, smile and refer the Comptroller to the unverifiable memory of an employee. That cannot be what the law requires.

### D. Nick's Spoliation Arguments Are Unavailing.

*Finally*, Nick's argues that the Comptroller's assessment must be set aside because the County Police destroyed the motherboards of the seized video poker machines, spoliation that, Nick's claims, the Comptroller was obliged to prevent. Nick's cites four cases for this proposition, all inapposite. These cases all stand for the unremarkable proposition that a party with possession or access to discoverable evidence bears the burden of notifying its opponent before allowing the evidence to be destroyed. *See Silvestri v. GMC*, 271 F.3d 583 (4th Cir. 2001) (plaintiff in a products liability case conceded that he had had unlimited access to the product, and an ability to prevent its destruction, and conceded that manufacturer could have and should have been given notice of his intent to sue before vehicle was destroyed, but was not); *Klupt v. Krongard*, 126 Md. App. 179 (1999) (a party, who had always been in possession of discoverable evidence, first concealed, and then intentionally destroyed that evidence); *Anderson v. Litzenberg*, 115 Md. App. 549 (1997) (party in possession of discoverable evidence destroyed that evidence). But here, the Comptroller neither possessed nor had access to the motherboards. He received a report from County Police based on *their* analysis of the motherboards. This report was produced to Nick's, and Nick's expert relied extensively on that report. The evidentiary advantage or gamesmanship that the spoliation rule seeks to prevent does not

24

exist here—both parties had the same access to the same evidence, and there is no misbehavior to sanction.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**